**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**January 27, 2004**

**Charles R. Fulbruge III**
**Clerk**

REVISED FEBRUARY 11, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 02-60493

---

JAKE AYERS, JR, Private Plaintiffs;

Plaintiff - Appellant

LILLIE B AYERS; LEOLA BLACKMON; RANDOLPH WALKER; HENRY BERNARD
AYERS; IVORY PHILLIPS, Dr; VERNON ARCHER, Dr; DOROTHY WALLS;
FRANCIS OLADELESHOWL, Dr; ALEX D ACHOLONU, Dr

Appellants

v.

BENNIE G THOMPSON, United States Congressman, Second
Congressional District Mississippi

Plaintiff - Appellee

and

PLAINTIFF/INTERVENORS (GOVERNMENT)

Intervenor Plaintiff - Appellee

v.

HALEY BARBOUR, Etc.; ET AL

Defendants

HALEY BARBOUR, Governor, State of Mississippi

Defendant - Appellee

BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING

Appellee

v.

LOUIS ARMSTRONG

Movant - Appellant

---

Appeal from the United States District Court for the
Northern District of Mississippi, Greenville

---

Before KING, Chief Judge, and JOLLY and DENNIS, Circuit Judges.

KING, Chief Judge:

African-American citizens of Mississippi, on behalf of
themselves and all others similarly situated ("the Private
Plaintiffs" or "the Private-Plaintiff class"), filed this class-
action lawsuit in 1975, seeking to compel the desegregation of
Mississippi's system of higher education.  After nearly thirty
years of litigation, a settlement agreement has been reached
between the Private Plaintiffs, the United States (which
intervened in this action in support of the Private Plaintiffs),
and the State of Mississippi.  Among other obligations, the
agreement promises approximately $500 million in funding over
seventeen years to remedy the present effects of Mississippi's
past policies of de jure segregation.  After conducting a hearing
on the fairness of the proposed settlement agreement and
receiving a concurrent resolution from the Mississippi
Legislature supporting the proposal and agreeing to fund it, the
district court approved the settlement.

Dissatisfied with the relief provided for in the agreement,

several of the Private Plaintiffs ("Appellants") appeal to this court, asking us to reverse the district court's decision and, thereby, to invalidate the settlement. Appellants also desire to opt out of this class action and, thus, to continue litigating this controversy. Finally, Appellants' attorney, who represented the Private-Plaintiff class for many years, contends that he must be permitted to proceed separately regarding his fees, even though the settlement agreement provides a lump sum for the fees of all the attorneys who have represented the Private Plaintiffs.

We have reviewed Appellants' objections to the settlement agreement, and we hold that the district court did not abuse its discretion in approving it. In addition, we conclude that the district court correctly denied Appellants' motion to opt out of the Private-Plaintiff class. Finally, we reject the assertion of Appellants' attorney that he is entitled to proceed separately regarding attorneys' fees. Accordingly, we affirm.

## I. Background

### A. Procedural History[1]

---

[1] The procedural history of this litigation has been chronicled in several prior court opinions. Except to the extent that it is relevant to this appeal, we do not repeat that history here. For proceedings regarding the first trial in this case, see Ayers v. Allain, 674 F. Supp. 1523 (N.D. Miss. 1987); Ayers v. Allain, 893 F.2d 732 (5th Cir. 1990); Ayers v. Allain, 914 F.2d 676 (5th Cir. 1990) (en banc); United States v. Fordice, 505 U.S. 717 (1992). For proceedings concerning the second trial, see Ayers v. Fordice, 879 F. Supp. 1419 (N.D. Miss. 1995); Ayers v. Fordice, 111 F.3d 1183 (5th Cir. 1997).

### 1. *Proceedings Through the First Appeal*

The Private Plaintiffs[2] filed suit against, among others, the Governor of Mississippi and the Board of Trustees of State Institutions of Higher Learning ("the Board"). The United States subsequently intervened as a plaintiff. In their complaints, the Private Plaintiffs and the United States alleged, <u>inter alia</u>, that the Defendants had not satisfied their affirmative obligation under the Equal Protection Clause and Title VI to disestablish the State's racially dual system of higher education.[3] After conducting a trial, the district court ruled that the State——by adopting race-neutral policies and procedures and taking certain affirmative actions——had satisfied its duty to reform the former <u>de jure</u> segregated state-university system. <u>Ayers v. Allain</u>, 674 F. Supp. 1523, 1564 (N.D. Miss. 1987). We affirmed. <u>Ayers v. Allain</u>, 914 F.2d 676, 692 (5th Cir. 1990) (en

---

[2] In September 1975, the district court certified, under Rule 23(b)(2), the following class:

> [A]ll black citizens residing in Mississippi, whether students, former students, parents, employees, or taxpayers, who have been, are, or will be discriminated against on account of race in receiving equal educational opportunity and/or equal employment opportunity in the universities operated by [the] Board . . . .

[3] Mississippi's state-university system consists of eight schools——five historically white universities and three historically black universities. The historically white universities are the University of Mississippi, Mississippi State University, Mississippi University for Women, the University of Southern Mississippi, and Delta State University. The historically black universities are Jackson State University, Mississippi Valley State University, and Alcorn State University.

4

banc).

### 2. The Supreme Court's Decision

Reversing, the Supreme Court held that both this court and the district court had applied an incorrect legal standard. See United States v. Fordice, 505 U.S. 717, 729-32 (1992). According to the Court's opinion,

> If the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects—whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system—and such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system. Such policies run afoul of the Equal Protection Clause, even though the State has abolished the legal requirement that whites and blacks be educated separately and has established racially neutral policies not animated by a discriminatory purpose.

Id. at 731-32. In other words, the Court ruled that the Equal Protection Clause and Title VI[4] require Mississippi to abolish any policy or practice that (1) is traceable to de jure segregation, (2) continues to have segregative effects, (3) is without sound educational justification, and (4) can be practicably eliminated.

Having articulated the legal standard to be applied on remand, the Court closed with an important clarification:

---

[4]     The Supreme Court opined that "the reach of Title VI's protection extends no further than the Fourteenth Amendment," thereby obviating the need to engage in distinct analyses. Fordice, 505 U.S. at 732 n.7; accord Ayers, 111 F.3d at 1191 n.5.

> If we understand [the Private Plaintiffs] to press us to order the upgrading of Jackson State, Alcorn State, and Mississippi Valley State solely so that they may be publicly financed, exclusively black enclaves by private choice, we reject that request. The State provides these facilities for all its citizens and it has not met its burden under Brown to take affirmative steps to dismantle its prior de jure system . . . .

Id. at 743. Thus, the Court affirmed that this litigation concerns eliminating the effects of prior legal segregation, not mandating equality among Mississippi's publicly funded educational institutions. Cf. Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 351 (1938) (explaining that the Fourteenth Amendment guarantees to individuals the equal protection of the laws).

### 3. The Second Trial and the Remedial Order

On remand, the district court applied the legal standard articulated by the Supreme Court and found vestiges of segregation with continued segregative effects in several areas of Mississippi's higher-education system. See Ayers v. Fordice, 879 F. Supp. 1419, 1477 (N.D. Miss. 1995). To reform these areas, consistent with the Supreme Court's emphasis on educational soundness and practicability, the district court issued a remedial decree, id. at 1494-96, and it ordered the establishment of a three-person committee to monitor the implementation of its decree. Id. at 1494. We describe below only those provisions of the decree that bear on this appeal.

Regarding admissions standards, the court accepted the

6

Board's proposed admissions policy, which remains in place today. Id. at 1494 (accepting the Board's proposed admissions policy); id. at 1477-79 (describing that policy). Previously, admissions standards were stricter at the historically white universities than at the historically black universities, and the standards were based almost exclusively on an applicant's performance on the American College Test (ACT). See Fordice, 505 U.S. at 734-35. The prior admissions standards were a vestige of de jure segregation that continued to have segregative effects: Because African-American applicants as a class scored lower on the ACT than white applicants, the standards effectively channeled black students to the historically black universities. See Fordice, 505 U.S. at 734-35. Under the Board's current policy, however, uniform standards govern admission to all of the State's universities. Ayers, 879 F. Supp. at 1477-78. Also, rather than being based almost entirely on ACT scores, the current admissions standards also take into account high school grades. Id. Further, applicants who do not meet the regular admissions criteria can still gain admission through completion of a spring screening process, which for some students leads to participation in a summer remedial program and further remedial instruction during the regular academic year. Id. at 1478-79.

The decree directed the implementation of the Board's proposals for the development of additional academic programs at

7

Jackson State, including programs in the field of allied health and graduate degrees in social work, urban planning, and business.  Id. at 1494.  The court further instructed the Board to conduct an institutional study of Jackson State, involving examination of the feasibility and educational soundness of providing additional academic offerings there, such as an engineering school, a law school, and a pharmacy program.  Id. at 1494-95.  Regarding Alcorn State, the district court ordered the establishment of an MBA program at the school's Natchez Center.  Id.  Additionally, the court ordered the Board to study whether desegregation in the two state universities in the Mississippi Delta region—Delta State and Mississippi Valley State—could only be achieved through consolidating the two institutions.  Id.

The remedial decree also directed the State to submit to the monitoring committee a report addressing the practicability of having the State assume control over the facilities-maintenance funds then controlled individually by each of the eight state universities.  Id.  The district court further instructed the Board "to study the feasibility of establishing system-wide coordination of the community colleges in the State in the areas of admissions standards and articulation procedures, and report to the Monitoring Committee" regarding its findings.[5]  Id. at

---

[5]    Although a separate lawsuit was underway regarding Mississippi's community-college system, the district court issued these directions respecting the community colleges because

1496.

### 4. *This Court's 1997 Opinion*

On appeal, while upholding most of the district court's decision, this court rejected a few of its conclusions, and we set forth several instructions to be followed on remand. We focus here only on those aspects of our 1997 opinion that are relevant to this appeal. We concluded that the district court erred in finding that the use of ACT cutoffs to award scholarships was not traceable to the de jure system and that this policy did not continue to foster segregation. Ayers v. Fordice, 111 F.3d 1183, 1209 (5th Cir. 1997), cert. denied, 522 U.S. 1084 (1998). Thus, we remanded for consideration of the practicability and educational soundness of reforming this aspect of the undergraduate scholarship policies at the historically white universities and of implementing, if necessary, appropriate

---

policies at those colleges impact access to the state-university system. See Ayers, 879 F. Supp. at 1474-75. Specifically, the district court observed that the community colleges are in a position to take students—who, upon graduation from high school, are not capable of succeeding at a four-year university—and to prepare them to transfer to a university and, thereby, to obtain a four-year degree. Id. Because these under-prepared students were often African-American, the court suggested that the community colleges were a valuable resource for integrating the four-year universities and for serving as an alternative route to a bachelors degree for black students. Id. Finding that the community colleges were not performing this task "to any great degree," the court therefore ordered the Board to study whether the universities and the community colleges should coordinate their admissions requirements and remedial programs. Id. at 1475.

remedial relief.  Id. at 1209, 1228.  In addition, we directed the district court to investigate the status of the Board's proposal to consolidate Mississippi Valley State and Delta State. Id. at 1214, 1228.  If the district court determined that the Board planned not to merge the two schools, we instructed the court to order the Board to study other methods of desegregating Mississippi Valley State, including adding academic programs at that school.  Id.  We also concluded that the Board should report to the monitoring committee on new academic and land-grant programs that would have a reasonable chance of increasing the number of non-African-American students attending Alcorn State. Id. at 1214, 1228.  Additionally, we remanded the issue of equipment funding, asking the district court to investigate the cause and segregative effect of disparities between the money received by the historically white universities and the historically black universities and, if necessary, to implement appropriate relief.  Id. at 1225, 1228.  Finally, we instructed the district court to monitor closely the effectiveness of the summer remedial program.  Id. at 1228-29.  We indicated that the program should be reformed as necessary to achieve the objective of identifying and admitting students who are capable—with reasonable remediation—of performing at the university level, but who fail to qualify for regular admission.  Id.

**5.    *Proceedings on Remand From Our 1997 Decision***

Below we briefly review the aspects of the proceedings conducted and the orders issued by the district court on remand from our 1997 decision in this case that are relevant to this appeal.

In June 1998, the district court ruled that it would no longer consider the consolidation of Mississippi Valley State and Delta State, since the Board had concluded that the merger was not practical. Thus, as we instructed it to do in our 1997 opinion, the court directed the Board to study programs that could be implemented at Mississippi Valley State to attract non-African-American students. Next, the district court found that the Board was in the process of implementing a Ph.D. program in social work at Jackson State. After observing that, in response to our 1997 decision, the Board had ceased using ACT scores as the sole criterion for awarding scholarships, the district court instructed the Board to submit information to the court and to the Plaintiffs regarding the educational soundness of using ACT scores as one aspect of the scholarship-award criteria.

In August 1998, the district court appointed a monitor to aid the court and the parties in implementing the remedial decree: Dr. Jerry Boone, a former state university administrator from Tennessee.[6]

---

[6] The court amended its previous order that had provided for a three-person monitoring committee. To the extent that Appellants now contend that either the district court's selection

11

In October 1999, the district court ruled that the Board had fully complied with several of its obligations concerning Jackson State. After considering the monitor's status report, the court concluded that the Board had implemented academic programs in allied health, social work (Ph.D.), urban planning (masters and Ph.D.), and business (Ph.D.) at Jackson State. The court also noted that the Board had conducted an institutional study of Jackson State and had prepared to establish an engineering school at the university. Accordingly, the court stated that the Board

of a sole monitor or the identity of the individual selected to serve as the monitor requires us to invalidate the parties' settlement, we reject their contention. Approximately six months after we handed down our 1997 decision in this case, the district court ordered each side to submit six names from which the court would select the monitoring committee. In the opinion accompanying its order, the court noted that the parties' failure to agree on the membership of the monitoring committee was delaying the implementation of the remedial decree. At that time, the Private Plaintiffs, who were represented by Alvin Chambliss (attorney for Appellants here), were busy seeking Supreme Court review of our 1997 decision. Consequently, counsel for the Private Plaintiffs chose not to address the issues then pending in the trial court, such as the composition of the monitoring committee. At the district court's direction, the United States submitted names of candidates for the monitoring committee on behalf of both itself and the Private Plaintiffs. Approximately two-and-a-half months after the district court's deadline for the submission of candidates had passed, the Private Plaintiffs filed a motion requesting access to the list of candidates submitted by the Defendants, but it does not appear that the Private Plaintiffs ever sought to submit their own list of candidates. While the record does not reflect precisely why the district court——faced with the parties' inability to agree on the committee's composition——eventually decided to appoint only one monitor, we cannot conclude that the court's action requires us to invalidate the present settlement. Further, we reject Appellants' unsupported attacks on Dr. Boone's qualifications to serve as the court-appointed monitor.

had complied with most of its duties regarding new academic programs at Jackson State.

In July 1999, the district court ruled that the Board had complied with the paragraph of the remedial decree concerning coordination of admissions standards and establishment of articulation agreements between the State's community colleges and its universities. The court found that Mississippi's community colleges had approved an open-admissions policy. Further, the court observed that the Board had standardized "an alternative procedure for students to qualify for university admission by completing specified requirements at a community college." The court also noted that, under the Board's policy, students who unsuccessfully attempt the summer remedial program are counseled regarding community-college enrollment.

In July 2000, the district court approved the Mississippi Legislature's appropriation of funds to construct a facility to house the court-ordered MBA program at Alcorn State's Natchez campus. See Ayers v. Fordice, No. 4:75CV009-B-D, 2000 U.S. Dist. LEXIS 9877, at *9 (N.D. Miss. July 6, 2000).

In January 2001, the district court issued an order regarding legal and pharmacy education at Jackson State. Finding no unmet demand for legal education in the Jackson area, the court concluded that the Board need not establish a law school at Jackson State for the purpose of desegregating that institution.

13

The district court also found that the existing pharmacy program at the University of Mississippi was meeting the State's need for pharmacy education. It further ruled that the creation of either a law school or a pharmacy school at Jackson State was neither feasible nor educationally sound.[7] The district court then announced that "[w]ith these issues resolved, the court finds that all elements of the Ayers Remedial Decree having to do with Jackson State University and involving significant expenditures of funds have now been completed."

In February 2001, the district court concluded that the Board's proposal regarding facilities-maintenance funds essentially satisfied this aspect of the remedial decree.

To summarize the status of this litigation when the district court was presented with the proposed settlement agreement, most of both the district court's remedial decree and our instructions on remand had been implemented. Thus, only the following issues remained to some extent unresolved: (1) further review of the uniform admissions standards;[8] (2) continued evaluation of the

---

[7] But, while noting that such a program was not required by the court's remedial decree, the district court approved the Board's proposal for an inter-institutional pharmacy program, jointly controlled by Jackson State, the University of Mississippi, and the University of Mississippi Medical Center.

[8] In June 1998, the district court ordered the Board to monitor freshman enrollment statewide to assess the impact of the uniform admissions standards. The district court had scheduled a hearing on the admissions standards, but it was postponed pending settlement negotiations. In his analysis of enrollment data from 1993-1998, the monitor reported "a substantial and fairly steady

summer remedial program;[9] (3) investigation of potential new

academic programs that might help to desegregate Mississippi

Valley State and Alcorn State; (4) assessment of equipment

funding; and (5) consideration of the use of ACT scores as a

component of the criteria for awarding scholarships.

## B. Proceedings Concerning the Settlement Agreement

### 1. The Settlement Agreement

After lengthy negotiations, all of the Defendants, the

---

increase in total freshmen enrollments, universities and community colleges combined, among resident black students." But he also noted that African-American freshmen were "drift[ing] away from the universities and toward the community colleges." In addition, the monitor cautioned against placing too much weight on the data, pointing out that his analysis dealt only with numbers from three years before and three years after the uniform admissions standards were instituted.

[9] The monitor also reported to the district court on the effectiveness of the summer remedial program. The monitor's assessment of the program was quite positive; he concluded: "Overall, I believe the spring screening and summer remedial program should be regarded as a success for those who attend the summer program. Most of the students who go through it complete it successfully and go on to attend one of the universities in the fall." Further, he noted that there had been "no reduction in black students attending college since the summer program was initiated, although a larger proportion are choosing to attend a community college," a result which did not trouble the monitor "because transfer arrangements between the universities and the community colleges make initial enrollment in a community college a clear alternative for university-bound students who prefer not to go through the summer program." Noting that many of the rejected applicants who did not participate in the spring screening process and the summer remedial program were apparently unaware of the programs' existence, the monitor recommended that the Board should be required to ensure that students who do not qualify for regular admission are adequately informed about the spring screening process and the summer remedial program, including the availability of financial aid for participants.

15

United States, and the lead Private Plaintiff (Congressman Bennie Thompson),[10] on behalf of both himself and the Private-Plaintiff class, reached a settlement agreement. By its terms, "[j]udicial approval of [the] Agreement is to relieve the Board, and all other defendants, of any further obligations under the remedial decree." Further, the "only obligations of the Board, and other defendants, arising out of or related to the Ayers litigation will be those specified in [the] Agreement." We describe below the major obligations contained in the Agreement.

> a.  *Financial Assistance for the Summer Remedial Program*

Under the agreement, the State will provide special funding in the amount of $500,000 annually for five years (from 2002–2006) and $750,000 annually for five additional years (from 2007–2011) to supplement the need-based financial aid presently available to summer program participants.[11] Further, the agreement obligates the Board to "widely" publicize both the opportunity to enroll in the summer remedial program and the

---

[10]    Congressman Thompson is one of the twenty-one original named plaintiffs in this suit, and in March 2000, the district court designated——for "purposes of efficient communications and organization"——Congressman Thompson as the "lead plaintiff" in this action.

[11]    The Board, however, "specifically reserves the right to no longer provide the summer program at certain Mississippi universities should future circumstances so warrant."

availability of financial aid for program participants.[12]

> b.    *Academic Programs*

The agreement provides for the establishment, continuation, or enhancement of a variety of academic programs at Alcorn State, Jackson State, and Mississippi Valley State.[13]  Further,

---

[12]    This provision is directly responsive to the monitor's recommendation that the Board adequately inform students who are denied regular admission about the summer program and the financial aid available to those who participate in it.

[13]    The specific programs or program areas named in the agreement are detailed below.  When a particular program is being or will be provided at a branch campus, that information is indicated parenthetically.

Alcorn State: (1) business administration, masters (Natchez campus); (2) accounting, masters (Natchez campus); (3) finance, bachelors (Lorman campus) and masters (Natchez campus); (4) physician assistants, masters (Natchez campus or Vicksburg campus); (5) biotechnology, masters (Lorman campus); (6) computer networking, bachelors (Vicksburg campus); (7) environmental science, bachelors (Lorman campus); (8) nursing; (9) teacher education; (10) mathematics and sciences (biology, chemistry, physics); and (11) computer science.

Jackson State: (1) business, Ph.D.; (2) urban planning, masters and Ph.D.; (3) social work, Ph.D.; (4) civil engineering, bachelors; (5) computer engineering, bachelors; (6) telecommunications engineering, bachelors; (7) public health, masters; (8) health care administration, bachelors; (9) communicative disorders, masters; (10) higher education, Ph.D.; (11) public health, Ph.D.; (12) Mississippi Interinstitutional Pharmacy Initiative; (13) school of allied health; (14) school of public health; (15) school of engineering (graduate programs in civil, computer, and telecommunications engineering will be considered for implementation upon accreditation of the baccalaureate engineering programs); (16) business; and (17) education.

Mississippi Valley State: (1) history, bachelors; (2) special education, masters and bachelors; (3) computer science, masters; (4) bioinformatics, masters; (5) leadership administration, masters; (6) business administration, masters; (7) biology; (8) chemistry; (9) computer science; (10) mathematics; and (11) special education.

17

beginning with fiscal year 2002, annual appropriations are to be provided to the historically black universities for seventeen years, in the total amount of $245,880,000, to fund the numerous academic programs detailed in the agreement.[14]

### c.    *Endowments*

The agreement establishes both a publicly funded and a privately funded endowment for the benefit of Alcorn State, Jackson State, and Mississippi Valley State.  Mississippi will create the public endowment, which will consist of $70 million, over the course of fourteen years.  Additionally, the agreement requires the Board to use its best efforts over a seven-year period to raise $35 million for the privately funded endowment.

Initially, the endowments will be managed by a seven-person committee composed of the presidents of the historically black universities, the Commissioner of Higher Education, two members of the Board, and a member to be agreed on by the other members.

---

[14]    The agreement also states that,
The Board will maintain the right to evaluate program implementation in light of program objectives including reservation of the right to direct reallocation of monies, in consultation with the presidents of the historically black universities, to other academic programs and other-race endeavors identified in this Agreement.  Given the considerable period of time covered by this Agreement, the Board further reserves the right to substitute academic programs, in consultation with the presidents of the historically black universities, for those presently identified should future circumstances so warrant.

The income from both endowments will be allocated 28.3% to Alcorn State, 43.4% to Jackson State, and 28.3% to Mississippi Valley State, with the schools being required to use the funds for other-race[15] marketing and recruitment, including the employment of other-race recruiting personnel and the award of other-race student scholarships. The schools may also expend the endowment income on the academic programs provided for in the agreement.

Alcorn State, Jackson State, and Mississippi Valley State will each receive its pro rata share of the endowments when the institution attains a total other-race enrollment of ten percent and sustains that enrollment for three consecutive years. After obtaining full control over the endowment funds, the historically black universities may use the income for "sound academic purposes such as faculty compensation, academic program enhancements and student scholarships."

### d.    Capital Improvements

The agreement authorizes various capital improvements, at a total cost of up to $75 million, at Alcorn State, Jackson State, and Mississippi Valley State.

### e.    Funding

According to the agreement, the funding necessary to implement the agreement's provisions supplements the usual

---

[15]    The agreement defines "other-race" as non-African-American.

appropriations made to the state-university system and does not supplant normal funding for Alcorn State, Jackson State, and Mississippi Valley State.

       *f.    Recognition of Jackson State as a Comprehensive University*

Acknowledging that Jackson State presently offers a broad array of academic programs and that its service area extends beyond the Jackson, Mississippi, metropolitan area, the Board agrees that Jackson State should be "recognized as a comprehensive university."  The additional programs, facilities, and other resources to which comprehensive recognition entitles Jackson State are those provided for in the agreement.

       *g.   Attorneys' Fees*

Under the agreement, the attorneys for the Private Plaintiffs will receive a total of $2.5 million for fees, costs, and expenses.  Additionally, the agreement states that

> The class representative (Congressman Thompson) and Class counsel Byrd, Derfner and Pressman specifically represent that North Mississippi Rural Legal Services, The Center for Law and Education, and Alvin O. Chambliss, Jr. have knowledge of these provisions (i) that the <u>Ayers</u> defendants' obligations for attorneys' fees, costs and expenses will be fully satisfied on payment of $2,500,000 . . . and (ii) that no present or former counsel for the Class, or member of the Class, may seek attorneys' fees, costs and expenses other than as set forth in this Agreement.

       *h.   Settlement Implementation*

The agreement obligates the Board to report annually to lead counsel for the Private Plaintiffs and counsel for the United

20

States on the agreement's implementation. In addition, it expresses the parties' decision to submit to the exclusive jurisdiction of the district court any dispute relating to the agreement. Also, the agreement will not become final until its approval is no longer subject to further appeal or judicial review.

### 2.   *Appellants' Motion to Opt Out*

Unhappy with the relief provided for in the agreement, Appellants filed a motion to opt out of the Private-Plaintiff class. After holding a two-day evidentiary hearing, the district court denied their motion. See Ayers v. Musgrove, No. 4:75CV009-B-D, 2001 U.S. Dist. LEXIS 19730, at *1, *18 (N.D. Miss. Nov. 26, 2001).

### 3.   *The District Court's Approval of the Settlement Agreement*

Several months after it ordered that notice of the proposed settlement be published in newspapers throughout Mississippi, the district court conducted a fairness hearing, receiving testimony from proponents of and objectors to the settlement. See Ayers v. Musgrove, No. 4:75CV009-B-D, 2002 WL 91895 (N.D. Miss. Jan. 2, 2002). The district court acknowledged that it had heard persuasive arguments both for and against approving the settlement. Id. at *3.[16] Despite having concerns about the

---

[16]   In its opinion, the court summarized the most weighty contentions on each side. See Ayers, 2002 WL 91895, at *3-4.

21

proposed settlement, including its high cost and long duration, the district court expressed a preference for ending this case through agreement of the parties. Id. at *4. But it worried that none of the parties involved had the authority to appropriate the substantial sum necessary to fund the proposal. Id. at *4. Accordingly, the district court stated that——if the Mississippi Legislature would endorse the agreement and agree to fund it——the court would approve the settlement. Id. at *5.

After the district court received a concurrent resolution evidencing the Legislature's support for and agreement to fund the settlement, the court issued a final judgment approving the settlement. According to the district court,

> [I]f the State of Mississippi through its elected representatives, the policymakers of the State, wants to go further in the enhancements to the historically black institutions than called for by the court——and they have advised the court they do——then their actions will be given precedence. It is not illegal to do more than that required by the Constitution.

Ayers v. Musgrove, No. 4:75CV009-B-D, slip op. at 2 (N.D. Miss. Feb. 15, 2002). The court's decision, inter alia, specified that (1) this suit is a class action certified under Rule 23(b)(2); (2) the settlement agreement is incorporated by reference into the final judgment; (3) the agreement "affords the Class Members considerable relief in light of the established law of this case, the present stage of these proceedings and the range of possible recovery through further litigation, and is, in all respects,

22

fair, reasonable, adequate and in the best interest of the Class"; and (4) all claims relating to this controversy are dismissed with prejudice.[17]  Id. at 2-4.  In addition to appealing the district court's final judgment approving the settlement, Appellants challenge the district court's denial of their motion to opt out of the Private-Plaintiff class.[18]

## II. Standard of Review

A district court's findings of fact must be accepted unless those findings are clearly erroneous, but we review de novo a district court's conclusions of law.  See Prudhomme v. Tenneco Oil Co., 955 F.2d 390, 392 (5th Cir. 1992).  In addition, "[o]ur appellate review of the district court's approval of a settlement is limited; an approved settlement will not be upset unless the court clearly abused its discretion."  Parker v. Anderson, 667 F.2d 1204, 1209 (5th Cir. Unit A 1982) (citing Young v. Katz, 447

---

[17]    Before turning to the merits of Appellants' contentions, we briefly observe that the funding provided for in the settlement agreement is apparently being withheld, pending final judicial approval of the parties' settlement.  At oral argument, counsel for the State explained that, while the Board continues to fulfill its obligations under the district court's remedial decree, implementation of the additional commitments contained in the agreement awaits final court approval of the settlement.

[18]    Below we address those of Appellants' contentions that we can adequately discern from the briefing.  Several of Appellants' arguments are insufficiently developed and are, therefore, waived.  See FED. R. APP. P. 28(a)(9)(A); L & A Contracting Co. v. S. Concrete Servs., Inc., 17 F.3d 106, 113 (5th Cir. 1994).

F.2d 431, 432 (5th Cir. 1971)); accord Reed v. Gen. Motors Corp., 703 F.2d 170, 172 (5th Cir. 1983). Finally, a district court's denial of a motion to opt out of a class certified under Rule 23(b)(2) is reviewed for abuse of discretion. See Penson v. Terminal Transp. Co., 634 F.2d 989, 994 (5th Cir. Unit B Jan. 1981).

## III. Discussion

### A.   The District Court's Approval of the Settlement Agreement

A district court has discretion to approve a class-action settlement under Rule 23(e) if the settlement is fair, adequate, and reasonable. Parker, 667 F.2d at 1208-09. Our cases instruct that the district court's "exercise of discretion is to be tested by inquiries that 'ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression.'" Reed, 703 F.2d at 172 (quoting Pettway v. Am. Cast Iron Pipe Co., 576 F.2d 1157, 1214 (5th Cir. 1978)). Further, six factors guide our review of a decision to approve a settlement agreement resolving a class-action suit:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

Id. (citing Parker, 667 F.2d at 1209). Accordingly, we focus

24

below on the <u>Parker</u> factors, and we also address both Appellants' inadequate-representation contention and their challenge to the agreement's provision regarding attorneys' fees.

### 1. *Fraud or Collusion*

Appellants' brief contains several vague assertions of collusion. Primarily, Appellants claim that they had insufficient access to and participation in the settlement negotiations. Further, they suggest that collusion occurred in the negotiation of attorneys' fees.

It is unclear why Appellants' attorney, Alvin Chambliss (who represented the Private-Plaintiff class for many years), did not participate in the settlement negotiations. The lead Private Plaintiff, Congressman Thompson, testified at the fairness hearing that every effort was made to keep Mr. Chambliss informed regarding the negotiations. Further, letters and facsimiles—indicating correspondence between lead counsel for the class and Mr. Chambliss concerning the settlement talks—were presented as exhibits at the fairness hearing. Regardless, the district court found Appellants' allegations of collusion to be unsupported. <u>Ayers</u>, 2001 U.S. Dist. LEXIS 19730, at *16. Because Appellants have pointed to no record evidence that contradicts this finding—let alone evidence showing it to be clearly erroneous—we reject their contention that collusion was present in the settlement negotiations.

25

## 2. *The Complexity, Expense, and Likely Duration of the Suit and the Stage of the Proceedings*

The second and third <u>Parker</u> factors——the complexity, expense, and likely duration of the litigation and the stage of the proceedings and the amount of discovery completed——weigh in favor of affirming the district court's decision.  First, regarding the second factor, settling now avoids the risks and burdens of potentially protracted litigation concerning several aspects of our remand instructions and the district court's remedial decree.  <u>See</u> <u>supra</u> notes 8-9 and accompanying text (describing five issues that were not fully resolved when the parties reached their agreement).  Specifically, settlement eliminates the transaction costs that further proceedings would impose on the process of desegregating Mississippi's state-university system.  The agreement also provides relief for the class sooner than continued litigation would.

Second, examination of the stage of the proceedings and the amount of discovery completed weighs in favor of upholding the settlement.  The several trials and appeals that have already occurred in this case have largely resolved the controlling legal issues.  Thus, the parties and the district court possess ample information with which to evaluate the merits of the competing positions.

## 3. *Likelihood of Success on the Merits and Range of Possible Recovery*

26

Because two trials and several appeals have already occurred in this case, the probability of the Plaintiffs' success on the merits and the range of possible recovery have largely been resolved. Our 1997 opinion conclusively determined nearly all of the State's obligations.[19] Most of our instructions to the district court in that opinion concerned the remedial decree, see Ayers, 111 F.3d at 1228-29, and as discussed above, the district court concluded—before the parties reached their settlement—that much of the remedial decree had been satisfied.[20]

Nevertheless, aside from their allegations of collusion, Appellants' main objections to the settlement agreement center on their view that the relief it provides is inadequate. Appellants primarily seek more money for academic programs and facilities at the historically black universities and lower admissions standards. But they also object to the requirement that the

---

[19] Appellants claim that Mississippi, in dismantling its former system of de jure segregation, has not complied with Title VI and several regulations and policies promulgated in accordance with that statute. But their reliance on Title VI and its implementing regulations is unavailing because Mississippi's obligations have been determined under the Fourteenth Amendment; both the Supreme Court and this court have stated that the requirements of Title VI extend no further than those of the Fourteenth Amendment. Fordice, 505 U.S. at 732 n.7; Ayers, 111 F.3d at 1191 n.5.

[20] To the extent that Appellants allege that the district court disregarded our 1997 remand instructions, we reject their contention. Appellants do not direct us to anything in the record that would support such an assertion.

historically black universities reach and sustain an other-race enrollment of ten percent before gaining full control over the endowments created by the settlement agreement.  Additionally, Appellants assert that the agreement does not adequately address institutional mission designations,[21] faculty salaries, governance, accreditation, and the allocation of land-grant functions between Alcorn State and Mississippi State University.  We address each of Appellants' specific contentions in turn below and explain why Appellants are unlikely to achieve greater relief through further litigation.

Concerning Appellants' desire for more funding for and

---

[21]   In 1981, the Board assigned missions to the state universities in Mississippi. <u>Ayers</u>, 674 F. Supp. at 1539.  A university's "mission" defines the institution's "role and scope" relative to the other institutions within the system. <u>Id.</u>  The Board designated the University of Mississippi, Mississippi State, and the University of Southern Mississippi as "comprehensive" universities. <u>Id.</u>  This designation indicates that these institutions offered a greater number and higher level of degree programs than did the remaining universities and that these schools were expected to offer a number of doctoral programs, but not in the same disciplines. <u>Id.</u>  Jackson State was classified as an "urban" university, indicating that its role was to serve the urban community of Jackson, Mississippi. <u>Id.</u> at 1539-40.  Mississippi Valley State, Alcorn State, Mississippi University for Women, and Delta State received the designation of "regional" university. <u>Id.</u> at 1540.  The regional designation signifies that these institutions were expected to focus on the provision of undergraduate education. <u>Id.</u>

While the agreement provides for the recognition of Jackson State as a comprehensive university, it also states that Jackson State's "use of the comprehensive description does not imply any change in [its] institutional mission classification.  Institutional mission designations are not being addressed by this Agreement."

28

programs at the historically black universities, our 1997 decision affirmed the district court's finding that "merely adding programs and increasing budgets is not likely to desegregate" a historically black university.  Ayers, 111 F.3d at 1213 (citation and internal quotation marks omitted).  Additionally, we upheld the district court's determination that the State's funding formula is not traceable to de jure segregation.  Id. at 1224-25.  While we did instruct the district court to investigate potential programmatic enhancements at Alcorn State and Mississippi Valley State for the purpose of desegregating those schools, id. at 1228, the settlement agreement makes ample provision for academic offerings at both universities.  Further, testimony of the Board's witnesses at the fairness hearing indicates that many of these programs were selected in accordance with our guidance that "well-planned programs that respond to the particular needs and interests of local populations can help to desegregate historically black institutions."  Id. at 1213-14.

As discussed above, several new academic programs have also been added at Jackson State, and the settlement agreement provides for the continuation of these programs in addition to the implementation of several new programs.  Appellants nonetheless assert that the settlement should be invalidated because programs in law, pharmacy, engineering, and public health

29

have not been established at Jackson State.  Further, they
contend that Jackson State should have partial control over the
University of Mississippi Medical Center, located in Jackson,
Mississippi.

Each of Appellants' contentions has been addressed by prior
court rulings.  First, the district court found, in its January
2001 order discussed above, that placing either a law school or a
pharmacy school at Jackson State was neither feasible nor
educationally sound; moreover, no party even sought such steps at
the time of the district court's ruling.[22]  Second, in the same
order, the district court noted that an engineering school and a
masters in public health program have already been implemented at
Jackson State, and the settlement agreement provides continued
funding for these offerings as well as funding for a school of
public health at Jackson State.  Third, regarding the University
of Mississippi Medical Center, our 1997 decision affirmed the
district court's finding that institutional affiliation between
Jackson State and the Medical Center had no desegregative
potential.  Id. at 1211, 1215.

Regarding facilities at the historically black universities,
our 1997 opinion also rejected "Plaintiffs' argument for general

_____

[22]     An inter-institutional pharmacy program, over which
Jackson State has partial control, was developed, however, and
the settlement agreement provides for the continuation of that
program.

30

funds to enhance facilities" at these schools. Id. at 1224.

Still, the settlement agreement provides up to $75 million for capital improvements at the historically black universities, including acquisition of property, construction of new buildings and repairs and renovation of existing ones, purchase of additional equipment, and landscaping and drainage installation. In addition, in its February 2001 order discussed above, the district court concluded that the Board had essentially satisfied its obligation under the remedial decree to assume greater control over funds for facilities maintenance.

Turning to Appellants' contentions respecting the current admissions policy, their hope for lower admissions standards also cannot be reconciled with our 1997 opinion, which specifically approved the district court's adoption of uniform admissions standards that are rigorous enough to exclude students incapable of succeeding at the university level. See id. at 1198-1200. In particular, we affirmed the district court's finding that the open admissions component of the standards then (and, apparently, again now) sought by the Private Plaintiffs was educationally unsound.[23] Id. at 1199. We did, however, instruct the district

_____

[23] At oral argument, Appellants advocated a return to tiered admissions standards, with the historically white universities employing stricter admissions criteria than the historically black universities. Appellants fail to recognize, however, that the Supreme Court condemned that prior policy as a vestige of de jure segregation with continued discriminatory effects. See Fordice, 505 U.S. at 734-35.

31

court to review the efficacy of the spring screening process and the summer remedial program. See id. at 1201, 1228-29. As discussed above, the court-appointed monitor's reports indicate that the summer program has been a success. Further, the settlement agreement responds to the monitor's primary recommendation regarding the summer program—i.e., that the program, and the availability of financial aid for participants, should be adequately publicized by the Board.

We also reject Appellants' objection to the requirement that each of the historically black universities achieve and maintain ten-percent other-race enrollment before receiving its share of the endowments. As the United States explains in its brief, the ten-percent threshold seeks to ensure that the historically black universities devote the endowment funds to promoting the desegregation of their schools, not to upgrading them "so that they may be publicly financed, exclusively black enclaves by private choice." Fordice, 505 U.S. at 743. This provision will not encourage the historically black universities to discriminate in admitting students because the current admissions standards are uniform across the state-university system; the schools lack discretion to deny entry to those applicants who meet the uniform criteria. Instead, the ten-percent threshold will provide the historically black universities with a legitimate incentive to

32

recruit and to attract other-race students.[24]

In addition, Appellants' complaint that institutional mission designations should have been addressed in the agreement is not well taken. In our 1997 opinion we observed that the district court's remedial decree "does not order any alteration of the mission designations," and we further noted that "[n]o party appeals retention of the mission designations per se." Ayers, 111 F.3d at 1211. But, even if we were to reconsider this issue now, the extensive programmatic enhancements at the historically black universities that have been implemented thus far and will be established as a result of the agreement are intended to remedy the present segregative effects of this particular vestige of de jure segregation. Cf. id. at 1213 ("The issue of programmatic enhancement directly implicates policies governing institutional missions, which the district court found to be traceable to the de jure system and to have current segregative effects.").

Finally, turning to Appellants' last four areas of concern, our 1997 decision affirmed the district court's 1995 rulings that no relief was warranted to remedy disparities in the salaries, the hiring, or the promotion of African-American faculty, id. at

_____

[24]    Moreover, we note that the ten-percent threshold responds to the monitor's observation that the historically white universities have been desegregating faster than the historically black universities.

33

1226-27; to modify the composition of the Board or its staff, id. at 1227-28; to address the Board's efforts regarding the accreditation of academic programs at the historically black universities,[25] id. at 1214-15; or to re-allocate land-grant responsibilities between Alcorn State and Mississippi State University, id. at 1217.

Accordingly, both the probability of the Plaintiffs' success on the merits and the range of possible recovery point strongly in favor of affirming. Rejection of the settlement and further litigation is unlikely to lead to greater relief for the Private-Plaintiff class, particularly since most of the relief sought by Appellants has been foreclosed by our 1997 decision in this case. The settlement agreement provides meaningful relief; in particular, it contains generous funding for (1) a variety of new and enhanced academic programs at the historically black universities and (2) financial aid for participants in the summer remedial program—a program lauded by the court-appointed monitor—to assist those denied admission under the current uniform standards. Further, we reiterate that the targeted programmatic enhancements provided for in the agreement are intended to promote desegregation at the historically black

---

[25] We did, however, instruct the district court to ensure that the then-existing business programs at Jackson State received accreditation. In June 1998, the district court determined that this step had been achieved.

34

universities.  To the extent that Appellants "press us to order the upgrading of Jackson State, Alcorn State, and Mississippi Valley State solely so that they may be publicly financed, exclusively black enclaves by private choice," the Supreme Court has rejected their contention.  Fordice, 505 U.S. at 743.

### 4. The Opinions of the Class Counsel, Class Representatives, and Absent Class Members

Appellants also assert that reversal is required because many class members oppose the settlement agreement.[26]  Our jurisprudence, however, makes clear that a settlement can be approved despite opposition from class members, including named plaintiffs.  See Reed, 703 F.2d at 174-75 (affirming the district court's approval of a settlement despite "the objections of twenty-three of twenty-seven named plaintiffs and nearly forty percent of the 1,517 member class"); Parker, 667 F.2d at 1207-08, 1214 (affirming a district court's approval of a settlement of a class-action suit even though nine of the eleven named plaintiffs opposed the settlement); Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977) ("A settlement can be fair notwithstanding a large number of class members who oppose it.").  That several

---

[26]  Appellants claim that approximately 4,000 class members, including more than half of the original named plaintiffs, do not support the settlement agreement.  But, while the record indicates that several class members oppose the settlement, the number does not appear to be anywhere near 4,000.  According to the district court's opinion regarding Appellants' motion to opt out of the class, ninety-nine Private Plaintiffs sought to opt out.  Ayers, 2001 U.S. Dist. LEXIS 19730, at *1.

35

class members desire broader relief, which has been foreclosed by prior court rulings, does not prevent judicial approval of this settlement agreement, which promises substantial relief to the class.

### 5.   Inadequate Representation

Appellants also argue that the district court erred in approving the settlement because the class was not adequately represented during the settlement negotiations.  Mr. Chambliss, Robert Pressman, and Armand Derfner have represented the Private Plaintiffs for many years.  In March 2000, attorneys from the law firm of Byrd and Associates entered an appearance on behalf of the Private Plaintiffs, which was "acknowledged and agreed to" by Mr. Chambliss.  Later that month, the district court designated Congressman Thompson as the lead plaintiff.  In May 2000, in response to an order from the district court, Congressman Thompson named Isaac Byrd and Byrd's law firm as lead counsel for the Private Plaintiffs.  Still, Mr. Chambliss, Mr. Pressman, and Mr. Derfner continued to represent the Private-Plaintiff class.[27]

It appears that Mr. Byrd and his firm took the lead in negotiating the settlement agreement on behalf of the Private Plaintiffs.  In their brief, Appellants criticize Congressman Thompson's and Mr. Byrd's representation of the class during the

---

[27]    Mr. Pressman and Mr. Derfner, in addition to Mr. Byrd, currently represent the Private-Plaintiff Appellees in this appeal.

36

settlement negotiations.  In particular, Appellants note that Mr. Byrd is primarily a plaintiffs' personal-injury lawyer and is inexperienced in civil-rights litigation.

In Reed, this court noted that "adequacy of representation and adequacy of settlement are different sides of the same question."[28]  703 F.2d at 175.  Further, we stated that "the settlement itself provides insight into adequacy of representation."  Id.; accord Parker, 667 F.2d at 1211 (stating that "generally an attorney who secures and submits a fair and adequate settlement has represented the client class fairly and adequately").  Here, the district court concluded that the settlement agreement is fair, adequate, and reasonable, and our analysis of the agreement in the context of the Parker factors reveals no abuse of discretion by the district judge.  We also observed in Reed that "it is the trial judge who can best know how well the class was represented."  703 F.2d at 175.  Here, the district court found "the allegations of inadequate representation of class members wholly unsubstantiated."[29]

_____

[28]    Indeed, Appellants' complaints about the representation provided by Congressman Thompson center on their disagreement with his view that the settlement agreement is satisfactory.

[29]    In its order naming Thompson lead plaintiff, the district court remarked that he "is one of the original named plaintiffs who brought this suit against the defendants herein and has been more active than any other plaintiff in pursuing this case, having appeared before the court on several occasions as a witness and representative of the plaintiff class and also at conferences."
Regarding the attorneys who negotiated the settlement

37

<u>Ayers</u>, 2001 U.S. Dist. LEXIS 19730, at *16.  Accordingly, because the agreement provides ample relief to the class and Appellants have not shown that any record evidence supports their inadequate-representation allegation, we refuse to invalidate the settlement on this ground.

### 6. *Attorneys' Fees*

Appellants also contend that the settlement should be rejected because the amount of attorneys' fees was negotiated along with the rest of the agreement.  But they fail to cite any authority for the proposition that a district court abuses its discretion when it approves a settlement agreement that contains a provision for attorneys' fees.  On the contrary, the Supreme Court has stated that, "[i]deally, of course, litigants will settle the amount of a fee."  <u>Hensley v. Eckerhart</u>, 461 U.S. 424,

---

agreement, the district court stated,
> Mr. Byrd, retained and named by Mr. Thompson, the lead private plaintiff, as lead counsel for the class, is a competent attorney whose co-counsel, Mr. Pressman and Mr. Derfner, undisputedly competent and long-time attorneys for the class, actively participated in the settlement negotiation process, along with the independent participation of the United States Department of Justice attorneys, whose competent representation of the United States for more than twenty-five years is undisputed.

<u>Ayers</u>, 2001 U.S. Dist. LEXIS 19730, at *16.  That counsel for the United States was personally involved in the settlement negotiations gives us an additional reason to conclude that the class was adequately represented.  <u>Cf.</u> <u>United States v. City of Miami</u>, 614 F.2d 1322, 1332 (5th Cir. 1980) (stating that, when approving a consent decree in a case in which the United States was the plaintiff, a court "can safely assume that the interests of all affected have been considered").

437 (1983).  True, the Court has suggested that, in cases where the plaintiffs request damages and the defendant offers to settle for a lump sum covering both damages and attorneys' fees, negotiating the allocation may present a conflict of interest for the plaintiffs' attorney.  But even in such cases, the Court has declined to prohibit simultaneous negotiation of liability and fees, stating that "a defendant may have good reason to demand to know his total liability."  White v. N.H. Dep't of Employment Sec., 455 U.S. 445, 454 n.15 (1982).  Indeed, in the context of civil-rights litigation seeking injunctive relief, the Court has opined that prohibiting agreement between the parties on attorneys' fees "might well preclude the settlement of a substantial number of cases."  Evans v. Jeff D., 475 U.S. 717, 733 (1986); cf. Armstrong v. Bd. of Sch. Dirs., 616 F.2d 305, 312, 326-27 (7th Cir. 1980) (affirming the district court's approval of a settlement agreement that resolved a public-school-desegregation class action and that provided for the attorneys' fees of both counsel for the named plaintiffs and counsel for the absent class members).  The provision for attorneys' fees therefore does not cause us to conclude that the district court abused its discretion in approving the settlement agreement.

### 7.   Conclusion

We have analyzed the agreement in the context of the Parker factors, and we hold that the district court did not abuse its

39

discretion in approving the settlement agreement. Further, we agree with the district court that Appellants' inadequate-representation argument fails, and we reject Appellants' assertion that the agreement's clause regarding attorneys' fees renders the settlement invalid.

## B. The District Court's Denial of Appellants' Motion to Opt Out of the Class

Appellants assert that they should have been permitted to opt out of the class because it does not satisfy the requirements of Rule 23(a). Alternatively, they claim that Rule 23 cannot be applied to deny them the opportunity to litigate their claims in a separate proceeding. Appellants raise two arguments in support of this alterative contention. First, they maintain that Mississippi state law affords them the right to proceed with a separate action[30] and that Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), requires us to apply state law rather than Rule 23. Second, Appellants suggest that refusing to permit them to opt out impinges on their First Amendment rights.

We have held that "a member of a class certified under Rule 23(b)(2) has no absolute right to opt out of the class." Penson, 634 F.2d at 994. Rather, a "district court . . . acting under its Rule 23(d)(2) discretionary power, may require that an opt-out right and notice thereof be given should it believe that such

---

[30]    See MISS. CONST. art. 3, § 24.

40

a right is desirable to protect the interests of the absent class members." Id. Typically, such cases involve "hybrid" Rule 23(b)(2) class actions, in which individual monetary relief for certain class members is sought in addition to class-wide injunctive or declaratory relief. Id. "Such a class action, at least in the relief stage, begins to resemble a 23(b)(3) action, and there has been more concern with protecting the due process rights of the individual class members to ensure they are aware of the opportunity to receive the monetary relief to which they are entitled." Id.

Here, the class was certified under Rule 23(b)(2) because Mississippi, in maintaining vestiges of its prior de jure system of higher education, had "acted [and] refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). This case is not a hybrid class action; the Private Plaintiffs have sought solely injunctive and declaratory relief throughout the litigation. Even in their briefs to this court, Appellants—while expressing their dissatisfaction with the extent of the relief provided for in the settlement agreement—do not request any individual relief, whether monetary or otherwise. Appellants' interests do not diverge from those of the Private Plaintiffs who support the settlement, except to the extent that

41

Appellants believe that they are entitled to greater class-wide injunctive relief.  Accordingly, since Appellants have failed to show the existence of individual claims that are separate and distinct from the claims for class-wide relief, the district court correctly concluded that no basis existed for it to exercise its discretion to allow Appellants to opt out.

Additionally, we reject Appellants' assertion that the requisites of Rule 23(a) have not been met here.  As discussed above, the district court confirmed class certification in its final judgment.  Aside from their allegation of inadequate representation, Appellants do not specify why—after nearly thirty years of litigation—they now feel that class certification was improper in this case.  Further, Appellants' inadequate-representation argument fails in this context for the same reason that this contention did not cause us to reverse the district court's approval of the settlement: Appellants provide nothing to contradict the district court's finding that class counsel and Congressman Thompson adequately represented the Private-Plaintiff class.

Finally, Appellants' contentions based on Erie and the First Amendment lack merit.  First, this is not a diversity case; thus, Erie is inapplicable.  Erie, 304 U.S. at 78 ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." (emphasis

added)).  Moreover, <u>Erie</u> does not affect the application of a Federal Rule of Civil Procedure, such as Rule 23, in federal court.  <u>See</u> <u>Hanna v. Plumer</u>, 380 U.S. 460, 470 (1965) ("The <u>Erie</u> rule has never been invoked to void a Federal Rule.").  Second, Appellants provide no authority for the proposition that denying them the right to opt out of a Rule 23(b)(2) class violates the First Amendment.

Appellants fail to articulate a viable ground for opting out of the class.  Consequently, we hold that the district court did not abuse its discretion in denying Appellants' motion.

## C.    Attorneys' Fees

Finally, Mr. Chambliss asserts that he is not bound by the provision for attorneys' fees in the settlement agreement.  He insists that he is entitled to have his fee determined by the district court.  Further, he claims that he should be compensated at the same level as the lawyers who represented Mississippi in its tobacco litigation.

Mr. Chambliss's contention lacks merit.  First, to the extent that Mr. Chambliss challenges the distribution of the sum provided in the settlement agreement for attorneys' fees, there is no order for us to review because the district court has yet to rule on the allocation of the attorneys'-fees money.[31]

---

[31]    The district court directed the Private Plaintiffs' attorneys to agree on the allocation of the funds provided in the agreement for attorneys' fees, or the court stated that it would

43

Second, if one reads Appellants' brief as arguing that the settlement agreement should not have been approved because the provision for attorneys' fees was improper, that contention is unavailing, as explained above. Third, Mr. Chambliss provides no authority for the proposition that he should be allowed to file a subsequent claim for attorneys' fees when the district court has approved a settlement that contains an agreement as to fees. The preferred view seems to be that a claim for attorneys' fees in a civil-rights action, which is authorized by 42 U.S.C. § 1988(b), is a single claim possessed by the client. See Evans, 475 U.S. at 730 & n.19; Richards v. Reed, 611 F.2d 545, 546 & n.2 (5th Cir. 1980). Here, the parties settled the class's attorneys'-fees claim along with the rest of this case. We therefore reject Mr. Chambliss's assertion that he is entitled to proceed separately regarding attorneys' fees. Further, until the district court approves an allocation of the funds provided in the settlement agreement for attorneys' fees, we cannot review whether Mr. Chambliss has received an appropriate share.

## IV. Conclusion

---

determine the allocation. Class counsel has proposed a division of the funds, which was negotiated and agreed to by five of the six lawyers and firms that have represented the Private-Plaintiff class. Only Mr. Chambliss neither participated in the discussions nor approved class counsel's proposal, even though he was repeatedly invited to participate in the negotiations. Nevertheless, the proposed division includes a significant share for Mr. Chambliss. It does not appear from the record that the district court has ruled on the proposed allocation.

44

Accordingly, we AFFIRM the judgment of the district court.