Calvin W. Burnett, Ph.D. Maryland Higher Education Commission
 CIVIL RIGHTS AND DISCRIMINATION
You have asked for our analysis of the standards by which Maryland higher education officials can assess whether the State has complied with its constitutional and statutory obligations to dismantle the de jure racial segregation — that is, segregation imposed by law — that was long part of the State's public higher education system. You ask for this opinion in view of the imminent expiration of the State's most recent agreement with the Office for Civil Rights ("OCR") of the federal Department of Education concerning desegregation of the system.
You ask that we focus on the factors articulated by the Supreme Court in United States v. Fordice, 505 U.S. 717 (1992). In that case, the Court held that a state that had abrogated the laws that enforced segregation in its higher education system was also required to demonstrate that it had not left in place policies that perpetuated segregation. The Court stated:
 If the State perpetuates polices and practices traceable to its prior system that continue to have segregative effects — whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system — and such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system. Such policies run afoul of the Equal Protection Clause, even though the State has abolished the legal requirement that whites and blacks be educated separately and has established racially neutral policies not animated by a discriminatory purpose.
Fordice, 505 U.S. at 731-32. In its opinion, the Court applied these criteria to four policies: admissions standards, program duplication, institutional mission assignments, and the state's continued operation of all previously segregated institutions.
In light of Fordice, you have asked:
1. How should higher education officials in Maryland assess whether policies and programs traceable to Maryland's history of racial segregation are "educationally justified" and can be "practicably eliminated?"
2. How should those officials assess whether the State has discharged its responsibilities with respect to four types of policies analyzed in Fordice: admissions standards, program duplication, institutional mission assignments and continued operation of all previously segregated institutions?
3. Are there other factors related to Maryland's higher education system that should be evaluated for this purpose and, if so, what are those factors?
In summary, our answers to your questions are as follows:
1. How to assess policies and programs generally underFordice: In our view, the Fordice decision requires the following four-step assessment of the State's higher education policies and practices:
 A — Is the policy or practice traceable to prior segregation?
If it is not, the inquiry ends.
If it is, then an analysis of the effects of the policy or practice is necessary.
 B — Does the policy or practice have segregative effects?
If it does not, the inquiry ends.
If it does, then the justification for the policy or practice must be evaluated.
 C — Is the policy or practice supported by sound educational purposes?
 If it is not, then it is not consistent with the State's obligations under the Equal Protection Clause and Title VI, as construed in the Fordice decision.
 If it is, then alternative ways of accomplishing those purposes must be considered.
 In evaluating educational justifications, substantial deference is accorded to the judgment of educators, particularly when that judgment advances well-reasoned goals and is supported by evidence. The priorities established in the State Plan for Higher Education or in the current OCR agreement can provide a sound educational basis for such policies.
 D — Can the educational purposes of the policy or practice be feasibly accomplished by less segregative means?
 If they can, then the policy or practice is not consistent with the State's obligations under the Equal Protection Clause and Title VI.
 If they cannot, then the policy or practice is consistent with the State's obligations under the Equal Protection Clause and Title VI.
2. How to assess whether the State has discharged itsresponsibilities with respect to the four policies identified bythe Supreme Court in Fordice: For each policy, the analysis set forth in (1) must be applied.
3. Whether other factors related to Maryland's highereducation system should be evaluated and, if so, what thosefactors may be.
The State's responsibilities extend to any policies and practices traceable to de jure segregation that have segregative effects. The current agreement with OCR identifies other factors that may be implicated in the dismantling of the State's previously segregated higher education programs.
In addition to the review of specific policies under theFordice standards, the assessment of Maryland's success in dismantling the system of de jure segregation must also take account of the extent to which the State has complied in good faith with the requirements of its desegregation plans over several decades.
This opinion sets forth the legal standards for evaluating Maryland's compliance with its desegregation obligations. We do not attempt to assess whether the State has in fact met those obligations.[1] Section I of this opinion discusses the legal principles applicable to the desegregation of higher education programs, starting with the desegregation law that preceded the Fordice decision and delineating specific guidance provided in Fordice. It also reviews Maryland's experience from 1969 to the present. Section II then applies the legal standards discussed in Section I to the State's current situation and explains our answers to your questions.
 I Background
A. Desegregation Plans for Public Education Programs
 1. Desegregation Cases Based on the Equal Protection Clause
The Fordice decision built upon nearly 40 years of jurisprudence on the desegregation of public education institutions. In Brown v. Board of Education, 347 U.S. 483
(1954), the Supreme Court declared that state-mandated segregation in public education violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. As the Court concluded, "in the field of public education the doctrine of `separate but equal' has no place. Separate educational facilities are inherently unequal." Id.
at 495. The Court reasoned that the separation of African American students "solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."Id. at 494.
Many jurisdictions responded to Brown by eliminating their legal prohibitions against racially mixed schools, but did little more. In 1968, the Supreme Court held that race-neutral school assignment policies alone did not satisfy a school system's constitutional obligations if they were ineffective in achieving desegregation. Green v. County School Board, 391 U.S. 430
(1968). Rather, the Court required education officials to take affirmative steps to transform their "dual" education systems into "unitary" ones in which "racial discrimination would be eliminated root and branch." 391 U.S. at 437-38. The Court noted that the racial identification of schools extended to every facet of the schools, including not only the racial composition of each school's student body, but also the faculty, staff, transportation, extracurricular activities, and facilities. Id.
at 435. The Court charged the school board with the duty to produce an affirmative desegregation plan "that promises realistically to work, and promises realistically to work now."Id. at 439 (emphasis in original).
The Green decision was followed by a wave of litigation and extensive, court-ordered desegregation plans nationwide to address the racial identifiability of individual schools as well as the other factors identified by the Court. Most of this litigation concerned elementary and secondary school ("K-12") desegregation plans. See, e.g., Swann v. Charlotte-MecklenburgBoard of Education, 402 U.S. 1 (1971) (Mecklenburg County, North Carolina); Keyes v. School District No. 1, 413 U.S. 189 (1973) (Denver, Colorado); Milliken v. Bradley, 418 U.S. 717 (1974) (Detroit, Michigan); Pasadena City Board of Education v.Spangler, 427 U.S. 424 (1976) (Pasadena, California).
In the case of segregated public higher education systems, there was considerably less litigation. Thus, prior to Fordice,
there was little clear guidance in the case law concerning a state's obligation to eliminate the remnants of legally imposed segregation that resulted in institutions now characterized as "traditionally white institutions" ("TWIs") and "historically black colleges and universities" ("HBCUs"). The few cases that reached the appellate courts met with disparate results.[2]
 2. Desegregation Plans under Title VI
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d etseq. ("Title VI"), bars discrimination "on the ground of race, color or national origin" by "any program or activity receiving Federal financial assistance." Federal financial aid for students and federal grants to institutions for research and other purposes subject public universities to the requirements of Title VI.[3] Beginning in 1969, officials in OCR, then part of the federal Department of Health, Education and Welfare ("HEW"),[4] asserted that states with formerly segregated higher education systems had "an affirmative duty to adopt measures necessary to overcome the effect of past segregation."E.g., Letter of Eloise Severinson, Regional Civil Rights Director, Region III, Office for Civil Rights, Department of Health, Education and Welfare, to James A. Sensenbaugh, Superintendent of Schools, Maryland State Department of Education (March 7, 1969) ("the 1969 OCR letter").[5] OCR took the position that "it is not sufficient that an institution maintain a nondiscriminatory admissions policy if the student population continues to reflect the formerly de jure racial identification of that institution." Id. OCR required 10 states with a history of de jure segregation, including Maryland, to develop desegregation plans for approval by OCR. As a "constructive approach" to meeting this obligation, OCR suggested that each state consider the submission of "a system-wide plan of cooperation between institutions involving consolidation of degree offerings, faculty exchange, student exchange, and general institutional sharing of resources." Id.
Apparently, OCR's 1969 initiative was ineffective. See Adamsv. Richardson, 480 F.2d 1159 (D.C. Cir. 1973) (en banc) (upholding determination that OCR's enforcement of certain higher education desegregation plans was inadequate). Nearly a decade after the original initiative, still dissatisfied with OCR's efforts, a federal district court ordered the submission of new plans in six states. At the same time, the court cautioned, "[t]he process of desegregation must not place a greater burden on Black institutions or Black Students' opportunity to receive a quality public higher education [and] should take into account the unequal status of the Black colleges and the real danger that desegregation will diminish higher education opportunities for Blacks." Adams v. Califano, 430 F.Supp 118, 120 (D.D.C. 1977).
After the Adams decision, OCR accepted desegregation plans from 13 states and referred others to the Department of Justice for enforcement proceedings. Clifton F. Conrad and Paul E. Shrode, The Long Road: Desegregating Higher Education, 6:1 Thought Action: The NEA Higher Education Journal (1990) at pp. 35, 40-41. By 1985, OCR determined that most of the previously segregated states were desegregated. Clifton F. Conrad and David J. Weerts, Federal Involvement In Higher EducationDesegregation: An Unfinished Agenda, in Public Funding of Higher Education, Edward P. St. John and Michael D. Parsons, ed., (2004) 60, 63. However, OCR had made no determination regarding the desegregation plans of six states, including Maryland, and those plans "expired" without action by OCR. Notice of Application ofSupreme Court Decision, 59 Fed. Reg. 4271 (January 31, 1994).
B. United States v. Fordice
The Fordice case involved the public higher education system in Mississippi. The end of de jure segregation of that system, pursuant to a court order in 1962, was a signal moment in the civil rights movement of the 1960s. See Taylor Branch, Partingthe Waters: America in the King Years 1954-63 (1989), pp. 647-70. However, the system remained segregated in fact. The United States joined a lawsuit filed by private plaintiffs in 1975 claiming that Mississippi officials had not met their obligations under the Equal Protection Clause and Title VI to dismantle the state's dual system of higher education. The parties unsuccessfully pursued voluntary resolution of the case during the next twelve years and, in 1987, the case proceeded to trial.
Having already eliminated race-based restrictions in student admissions, faculty hiring, and operations in its five TWIs and three HBCUs, Mississippi contended that it had satisfied its desegregation obligations. The federal government and the private plaintiffs asserted that those actions alone were ineffective in altering racial imbalance in the universities and that the state had, in various ways, reinforced the race-based distinctions among the universities. After a lengthy trial, the federal district court concluded that the state had met its duty to dismantle university system segregation — a conclusion upheld on appeal by the Fifth Circuit Court of Appeals. Ayers v. Allain,914 F.2d 676 (5th Cir. 1990) (en banc). The appellate court distinguished Green and similar cases on the grounds that, unlike K-12 schools, the racial identifiability of a university is a matter of student choice not under the control of university officials. The case then moved to the Supreme Court.
In its 1992 decision, the Supreme Court finally resolved the question of whether public higher education institutions formerly subject to de jure segregation were required to take affirmative steps beyond the elimination of the legal underpinnings of segregation. The Supreme Court rejected the Court of Appeals' reasoning, observing that, even in a race-neutral admissions system, "student attendance is determined not simply by admissions policies, but also by many other factors" and that some of those factors may be attributable to prior state policies. Fordice, 505 U.S. at 729. Thus, the Court concluded: "If policies traceable to the [State's prior] dejure system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices." Id. (citations omitted).
The Court stated that certain aspects of a state's segregated higher education system that survived desegregation, even though race-neutral on their face, continued to "restrict a person's choice of which institution to enter, and . . . contribute to the racial identifiability of the eight public institutions." Id.
at 733. The Court held that a state that had formerly enforced segregation bears the burden of proving that such policies are educationally justified and cannot be practicably eliminated. Accordingly, Mississippi was directed to "justify these policies or eliminate them" upon remand to the lower court. Id.
The Court went on to identify four specific elements of Mississippi's higher education programs that it found "constitutionally suspect" based upon factual findings of the lower court: admissions standards, program duplication, institutional mission assignments, and continued operation of all eight of Mississippi's public universities.
Admissions Standards. The Supreme Court held that Mississippi's public university admissions standards were "not only traceable to the de jure system and were originally adopted for a discriminatory purpose, but they also have present discriminatory effects." Id. at 734. The state's minimum admissions standards were based solely on ACT testing scores, with the threshold scores for automatic admission much higher at the TWIs than those at the HBCUs. Noting that, in 1985, 72% of Mississippi's white seniors met the minimum ACT score for automatic admission to the TWIs but less than 30% of African American seniors did, the Court held that the state had not provided an adequate justification for the disparate automatic entrance standards. In particular, the Court raised concerns that the dual standards applied to TWIs and HBCUs with similar educational missions, and that automatic admissions standards failed to consider other factors, notably high school grades.Id. at 735-37. The Court held that the State had failed to show that the policy was not "susceptible to elimination without eroding sound educational policy." Id. at 738.
Program Duplication. The Court also took issue with "widespread" duplication of programs in Mississippi's TWIs and HBCUs, observing that "unnecessary" program duplication between TWIs and HBCUs was "part and parcel of the prior dual system of higher education." Id. at 738. Thus, such duplication is constitutionally suspect. The Court adopted the district court's definition of "unnecessary" program duplication as "those instances where two or more institutions offer the same nonessential or noncore program. Under this definition, all duplication at the bachelor's level of nonbasic liberal arts and sciences course work and all duplication at the master's level and above are considered to be unnecessary." Id. It emphasized that a state has the burden of proving the such duplication is educationally sound and its elimination is impracticable. Id.
at 738-39.
Institutional Mission. The Court also held that Mississippi's assignment of limited missions to its HBCUs, while designating broader missions for most of the State's TWIs, was traceable to "policies enacted to perpetuate racial separation during the dejure segregated regime." Id. at 740. With the designation of three TWIs as "comprehensive" institutions, Mississippi ensured that those programs would continue to offer the broader academic programs and graduate degrees and receive commensurately greater funding. By contrast, the State's HBCUs were all classified as "regional" or "urban" universities whose mission was limited largely to undergraduate education. Thus, the Court charged the district court, on remand, to "inquire whether it would be practicable and consistent with sound educational practices to eliminate any . . . discriminatory effects of the State's present policy of mission assignments." Id. at 741.
Continued Operation of All Institutions. The fourth element of Mississippi's higher education system highlighted by the Court was the state's continued operation of all eight of the institutions established under de jure segregation. The Court noted that the existence of so many distinct universities was "undoubtedly occasioned by state laws forbidding the mingling of the races" and that "as the District Court recognized, continuing to maintain all eight . . . is wasteful and irrational." Id.
Thus, the Court remanded the issue of "whether retention of all eight institutions itself affects student choice and perpetuates the segregated higher education system, whether maintenance of each of the universities is educationally justifiable, and whether one or more of them can be practicably closed or merged with other existing institutions." Id. at 742.
The Court summarized its holdings by characterizing de jure
segregation as an impediment to "the free choice of prospective students" and that, accordingly, the state's duty is to ensure that "this choice is now truly free." 505 U.S. at 742-43. The Court acknowledged that the fact that "an institution is predominantly white or black does not in itself make out a constitutional violation." It emphasized nonetheless that a "State may not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound educational policies." Id. at 743.
Finally, the Court addressed whether the plaintiffs' request for enhanced funding for HBCUs was necessary to dismantle Mississippi's segregated system. The Court emphasized that such funding increases were not required merely to upgrade the HBCUs as "publicly financed, exclusively black enclaves by private choice" and that perpetuation of "a separate, but `more equal'" system would not satisfy the State's constitutional obligations under Brown. Id. at 743. The Court stated that "whether an increase in funding is necessary to achieve a full dismantlement [of the dual system] is a different question," which it left to the district court on remand.
In a concurring opinion, Justice O'Connor emphasized that a state like Mississippi could maintain policies traceable to prior segregation with continuing segregative effects only in very limited circumstances. Id. at 744. She observed that, if a state can accomplish its educational goals through less segregative means, the courts may infer "a lack of good faith" and place the burden on the state to explain its preference for an apparently less effective method. Id. If a state "shows that the maintenance of certain remnants of its prior system is essential to accomplish its legitimate goals, then it still must prove that it has counteracted and minimized the segregative impact of such policies to the extent possible." Id. Thus, the state has the burden of showing that its legitimate policies cannot be accomplished through less segregative means.
Justice Thomas also concurred that policies traceable to segregation must be reformed to the extent practicable, consistent with sound educational practices. However, he wrote separately to stress that the Court did not "foreclose the possibility that there exists `sound educational justification' for maintaining historically black colleges as such." Id.
at 748. Citing the important educational and cultural role that HBCUs have played, he urged that the Court's decision should be read to allow a State to "operate a diverse assortment of institutions — including historically black institutions — open to all on a race-neutral basis, but with established traditions and programs that might disproportionately appeal to one race or another." Id. at 749.
Although partially concurring in the judgment, Justice Scalia also dissented and criticized the majority opinion as "provid[ing] no genuine guidance" and "as likely to subvert as promote the interests of those citizens on whose behalf the present suit was brought." Id. at 749-50. Justice Scalia also asserted that the opinion threatened the continued existence of public HBCUs, and predicted years of "litigation-driven confusion and destabilization . . . that will benefit neither blacks nor whites, neither predominantly black institutions nor predominantly white ones." Id. at 760-62.
Reaction to the Court's opinion was mixed. Federal court judges charged with applying the Court's opinion voiced concern over a lack of guidance.[6] While many civil rights leaders initially lauded the opinion, others worried that it could be interpreted to jeopardize the viability of HBCUs. Scott Jaschik,High-Court Ruling Transforms Battles Over Desegregation atColleges in 19 States, The Chronicle of Higher Education (July 8, 1992), p. 16. Legal scholars lamented the absence of direction from the Court on major issues, including the constitutionality of public HBCUs and standards by which states could justify policies with continuing segregative efforts on the grounds of "educational soundness." E.g., Wendy Brown-Scott, RaceConsciousness in Higher Education: Does "Sound EducationalPolicy" Support the Continued Existence of Historically BlackColleges, 43 Emory L.J. 1, 58 (1994) (Court provided "little guidance" on how to answer critical questions and left future of HBCUs in doubt); Clifton F. Conrad and David J. Weerts, "Federal Involvement In Higher Education Desegregation: An Unfinished Agenda," in Public Funding of Higher Education, Edward P. St. John and Michael D. Parsons, ed., (2004) 66-67 (summarizing concerns by scholars and policymakers over questions left unanswered by Fordice). Leland Ware, The Most Visible Vestige:Black Colleges after Fordice, 35 B.C. L.Rev. 633, 672 (1994) (Fordice leaves states' obligations unclear and the future of public HBCUs uncertain).
C. Post-Fordice Developments in the Desegregation of Public Education Programs
 1. Post-Fordice Litigation
Contrary to the expectations of some,[7] Fordice did not engender significant additional litigation over the desegregation of public universities. In the four states with proceedings pending at the time of the 1992 decision — Mississippi, Alabama, Louisiana, and Tennessee — litigation continued for many years, as the federal courts applied theFordice opinion. In 1995, for example, Mississippi transformed its student admissions policies from the standardized test-driven system rejected by the Court to a uniform statewide standard.Ayers v. Fordice, 879 F.Supp. 1419, 1494 (N.D.Miss. 1995),aff'd, 99 F.3d 1136 (5th Cir. 1996), mod'f'd,111 F.3d 1183 (5th Cir. 1997), cert. denied, 522 U.S. 1084 (1998).
Program duplication issues arose, with the courts scrutinizing examples of "unnecessary" program duplication for educational soundness and their impact on the racial identifiability of institutions. See, e.g., Geier v. Sundquist, 128 F.Supp.2d 519
(M.D.Tenn. 2001) (Tennessee's final settlement agreement includes process for reviewing new program proposals for impact on desegregation at HBCUs); United States v. Louisiana,9 F.3d 1159, 1170 (5th Cir. 1993) (continued existence of duplicative program required analysis of whether the program advanced TWI's academic goals).
The closure and merger of programs was proposed in Mississippi, but ultimately rejected, as an appropriate desegregative measure.Ayers v. Fordice, 111 F.3d 1183, 1214 (5th Cir. 1997),cert. denied, 522 U.S. 1084 (1998). Additional funding in the form of minority scholarships and program and capital improvements to HBCUs was incorporated into all of the remedial plans. See Knight v. State of Alabama, 900 F.Supp. 272, 349
(N.D.Ala. 1995) (establishing Trusts for Educational Excellence at two Alabama HBCUs); Geier v. Sundquist,128 F.Supp. 2d at 547 (state-funded scholarship programs included in desegregation remedy). To our knowledge, proceedings have been completed in all four states, no other cases were filed, and, to date, the Supreme Court has not revisited questions related to higher education desegregation.
 2. Standards for Ending Federal Supervision of Desegregation Decrees
Coincident with Fordice, the Supreme Court also addressed the conditions under which the courts would relinquish supervision of K-12 school systems under desegregation decrees. In Board ofEducation of Oklahoma City v. Dowell, 498 U.S. 237 (1991), the Court considered whether such a decree should be dissolved, even if the school system had not succeeded in achieving racial balance. The Court directed the district court to end its supervision upon a determination that "the Board had complied in good faith with the desegregation decree since it was entered, and . . . the vestiges of past discrimination had been eliminated to the extent practicable." Id. at 249-50. The Court observed that the school board had complied with the desegregation order for 13 years and that this lengthy "passage of time enables the District Court to observe the good faith of the school board in complying with the decree." Id. at 249.
In another case decided the same year as Fordice, the Court held that the district court had authority to "relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations." Freeman v. Pitts, 503 U.S. 467, 490 (1992). Considering whether elements of the decree should be abandoned in the face of racial imbalances in student body composition traceable to demographic change in the county, the Court articulated a three-part standard: (1) "whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn;" (2) "whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system;" and (3) "whether the school district has demonstrated to the public and to the parents and students of the once disfavored race, its good faith commitment" to the court's decree and the laws that were the basis for judicial intervention. Id. at 491. The Court further observed that a school system demonstrates good faith commitment when "its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." Id.
Since 1992, courts have applied the standards of Dowell andFreeman to return control of school systems subject to K-12 desegregation orders to local jurisdictions. Wendy Parker, TheDecline of Judicial Decisionmaking: School Desegregation andDistrict Court Judges, 81 N.C. L.Rev. 1623, 1633 (2003).
3. OCR Response to Fordice
Two years after the Fordice decision, OCR, by then a part of the United States Department of Education, published a notice of its enforcement policies under Title VI in light of Fordice.Notice of Application of Supreme Court Decision,59 Fed. Reg. 4271 (January 31, 1994). The Notice affirmed that all states with a history of de jure segregated systems of higher education — even those previously found in compliance with Title VI — continued to have an affirmative duty to ensure that no vestiges of the past system had a present discriminatory effect based on race. The Notice also indicated OCR's intent to apply theFordice standards in pending evaluations in six states, including Maryland, where Title VI desegregation plans had expired. In the wake of the Supreme Court's ambiguous statements regarding the future of HBCUs, however, the Notice indicated an intent to safeguard their viability:
 States may not place unfair burdens upon black students and faculty in the desegregation process . . . State systems of higher education may be required, in order to overcome the effects of past discrimination, to strengthen and enhance [HBCUs]. The Department will strictly scrutinize State proposals to close or merge [HBCUs], and any other actions that might impose undue burdens on black students, faculty or administrators or diminish the unique roles of those institutions.
Id. Five years later, OCR notified officials of the remaining states whose OCR-accepted desegregation plans had "expired" before the Fordice decision of its intent to resume review of those states' compliance with Title VI. OCR announced its desire to initiate "partnership agreements" with each of those states to agree on steps by which the states' compliance with Title VI would be measured. E.g., Letter of Norma V. Cantu, Assistant Secretary for Civil Rights, Department of Education, to Governor Parris N. Glendening (October 4, 1999).
D. Maryland's Higher Education Desegregation Efforts
 1. Early Plans and Litigation with OCR
Maryland was one of the 10 states notified in 1969 by OCR that its higher education system was operating in violation of Title VI and applicable federal law. Letter of Eloise Severinson, Regional Civil Rights Director, Region III, Office for Civil Rights, Department of Health, Education and Welfare, to James A. Sensenbaugh, Superintendent of Schools, Maryland State Department of Education (March 7, 1969). Strained efforts at the development and implementation of desegregation plans took place for the next five years. After its first plan was rejected by OCR, Maryland submitted a revised plan in 1970. OCR did not object to the 1970 plan at that time, and the State began implementation. Three years later, however, OCR reviewed and rejected the 1970 plan.See Mandel v. United States Department of Health, Education andWelfare, 411 F. Supp. 542, 547-48 (D.Md. 1976), aff'd sub nom.,Mayor and City Council of Baltimore v. Matthews, 571 F.2d 1273
(4th Cir. 1978) (en banc).
The parties agreed to yet another plan in 1974, and the State began implementation. Despite the agreement, the next year, OCR made a set of demands requiring rapid implementation. Further negotiations ensued, and OCR agreed to suspend those timelines pending additional discussions of voluntary compliance. These discussions proved fruitless and, in December 1975, OCR announced that it was initiating enforcement proceedings against Maryland.See Mandel, supra, 411 F. Supp. at 550.
Maryland then sued the Secretary of HEW, seeking to enjoin the enforcement proceedings. The district court granted an injunction, finding that OCR had not negotiated with State officials in good faith, that its timelines were "outrageous," and that it had failed to provide clear, consistent compliance standards. 411 F. Supp. at 553, 548 n. 17. The district court ultimately concluded that OCR had violated the requirements of Title VI and "arbitrarily and whimsically failed to attempt to work toward compliance by voluntary means and [had] vindictively refused to assume a programmatic approach." Id. at 563-64. The Fourth Circuit affirmed the grant of a preliminary injunction against OCR. 571 F.2d at 1276.
2. 1985 Plan
The State nonetheless continued its desegregation efforts, including the development of a 1980 desegregation plan to continue, expand and improve upon initiatives included in the earlier plans developed with OCR. See Maryland State Board for Higher Education, A Plan to Assure Equal PostsecondaryEducational Opportunity 1980-1985 (1980). In 1985, the State and OCR negotiated yet another plan to improve ethnic and racial diversity in the student bodies and faculties of Maryland's TWIs and enhance the State's HBCUs. Maryland's Plan to Assure EqualPostsecondary Educational Opportunity, 1985-1989 ("the 1985 Plan"). The 1985 Plan contained 23 objectives, including the following:
 • Adoption of new mission statements for all 4-year institutions
 • Additional operating and capital funding for HBCUs enhancements
• Implementation of 13 new academic programs at HBCUs
 • African American enrollment and graduation increases in TWIs and community colleges
 • Affirmative action initiatives to increase African American faculty administrators
 • Increases in financial aid for African American students
 • Strengthened role of the Maryland Higher Education Commission ("MHEC").
OCR agreed that implementation of the 1985 Plan over five years would satisfy Maryland's higher education desegregation obligations under Title VI. Id. The State submitted annual monitoring reports and, in 1991, a final report that outlined Maryland's full or substantial compliance with nearly all of the plan's objectives.[8] See Maryland Higher Education Commission, Plan to Assure Equal Postsecondary EducationOpportunity 1985-1989, Final Report (1991). OCR did not contest the State's assessment of its compliance or otherwise respond concerning Maryland's compliance until approximately 10 years after the 1985 Plan had ended.
In the intervening years, during which Fordice was decided, the State continued efforts to improve educational opportunity for African American students. These included the establishment of MHEC accountability measures to assess minority enrollment and achievement, grants to HBCUs to promote student recruitment and retention, the development of a statewide strategic plan whose goals included African American student achievement, increased financial aid to disadvantaged students, and the implementation of a range of "best practices" to promote diversity and improve conditions for African American students. Maryland Report andPartnership Agreement Between The State of Maryland and U.S.Department of Education, Office for Civil Rights (2000) pp. 4-15.
3. 2000 Partnership Agreement
In October 1999, OCR finally contacted Maryland again concerning the status of the State's desegregation efforts. Letter of Norma V. Cantu, Assistant Secretary for Civil Rights, Department of Education, to Governor Parris N. Glendening (October 4, 1999). OCR apologized for the failure to provide "any official notification from our office regarding your status under the previous Plan," and acknowledged Maryland's continuous efforts to "enhance equal education opportunities for African American students." OCR proposed the initiation of another Title VI compliance review, this time in the form of a "partnership" between the State and OCR. As a result, on December 6, 2000, a five-year "Maryland Report and Partnership Agreement Between the State of Maryland and U.S. Department of Education, Office for Civil Rights" ("the 2000 Agreement") was signed.
The agreement consists of nine commitments, each with a series of specific compliance tasks, timelines, and reporting requirements. It will expire on December 31, 2005. During the past five years, the Maryland Higher Education Commission (MHEC) has provided required monitoring reports to OCR. MHEC is to submit a final report upon the agreement's termination. Although the 2000 Agreement requires OCR to review and respond to the periodic reports filed by MHEC within 60 days of their submission, conduct annual site visits in Maryland, meet semi-annually with Maryland officials, and otherwise provide "regular feedback," 2000 Agreement at pp. 40-41, we understand that OCR has not done so.
The 2000 Agreement requires OCR to prepare a final report in March 2006 and to determine whether it believes that the commitments have been implemented. 2000 Agreement at p. 42. If OCR agrees that the commitments have been met, it is to acknowledge formally in writing that the State of Maryland has dismantled de jure segregation in its public higher education system. If this should not be the case, the State and OCR would decide jointly or independently the next steps to be taken. Id.
 II Analysis
We turn now to the questions you asked. Each of those questions relates to the assessment of Maryland's compliance with its constitutional and statutory obligations to dismantle the dejure segregated higher education system that once prevailed in the State.
A. The General Standard in Fordice
You first ask how to assess whether policies and programs traceable to the State's segregated history are "educationally justified" and cannot be "practicably eliminated." As outlined above, those criteria derive from the overarching principle articulated in Fordice: "If policies traceable to the de jure
system are still in force and have discriminatory effects, those policies . . . must be reformed to the extent practicable and consistent with sound educational practices." 505 U.S. at 729.
We approach this task with a degree of caution. As both the courts and legal scholars have observed, see Section I.B above, the Supreme Court did not elaborate in Fordice what it meant by "educational justification" or "practicable elimination" of policies traceable to de jure segregation. There is scant subsequent case law upon which to draw and, aside from the 1994 OCR Notice, federal enforcement authorities have provided little published guidance. However, the Court's holdings in other education desegregation cases and the few judicial opinions construing Fordice offer some direction.
1. Assessment of Compliance with Desegregation Obligations
The general standard for determining whether a state or school system has met its court-ordered desegregation obligations was stated in Dowell: "whether the Board had complied in good faith with the desegregation decree since it was entered and whether the vestiges of past discrimination had been eliminated to the extent practicable." 498 U.S. at 249-50. Particularly where a desegregation remedy has been in place for years, the "passage of time enables the District Court to observe the good faith of the school board in complying with the decree." Id. at 249.
To apply this general principle in the context of higher education desegregation plans, we believe that Justice O'Connor's concurring opinion in Fordice offers a demanding, but workable, standard. As articulated by Justice O'Connor, a state could maintain policies traceable to prior segregation with continuing segregative effects only under the most "narrow" circumstances.Fordice, 505 U.S. at 744. Specifically, whether a state has demonstrated good faith compliance turns on the state's showing of two elements: (1) that "maintenance of certain remnants of its prior system is essential to accomplish its legitimate goals," and (2) that the state "has counteracted and minimized the segregative impact of such policies to the extent possible."Id.
 2. Policies Traceable to Past De Jure Segregated System
The threshold question is whether a policy or practice is "traceable to the de jure segregated system" with current discriminatory effects. Fordice, 505 U.S. at 729. If there is no nexus between past segregation and the policy or practice, theFordice analysis simply does not apply.
There is no doubt that Maryland operated de jure segregated public higher education programs before 1969 when OCR found the State in violation of Title VI, and that some policies, such as program duplication at geographically proximate schools, are traceable to that era. However, in some instances, such a link cannot be made. See, e.g., Ayers v. Fordice, 111 F.3d 1183,1207-9 (5th Cir. 1997), cert. denied, 522 U.S. 1084 (1998) (policy governing nonresident fee waivers for children of alumni not traceable to de jure segregation); United States v.Louisiana, 9 F.3d at 1167 (questioning whether state's open admissions policy was traceable to de jure segregation);Knight, 900 F. Supp. at 337-39 (holding that lack of black studies program at TWI was not traceable to de jure segregation and noting that many HBCUs did not have such programs). In addition, new developments in higher education in recent decades, such as the increased role of community colleges and on-line education, have affected the content and delivery of higher education. The extent to which policies and practices relate to such developments, rather than to the formerly segregated system, bears consideration.
3. Segregative Effects
With respect to those policies and practices that are traceable to the period of de jure segregation, the next question is whether those policies and practices have continuing segregative effects. A policy has segregative effects "by influencing student enrollment decisions or by fostering segregation in other facets of the university system." 505 U.S. at 731. The Court explained that such policies had robbed students of genuine free choice in their pursuit of higher education: "Because the former de jure
segregated system of public universities in Mississippi impeded the free choice of prospective students, the State in dismantling that system must take the necessary steps to ensure that this choice now is truly free." 505 U.S. at 7424-3; see also505 U.S. at 729, 733. Thus, policies rooted in de jure segregation which may frustrate the ability of students to choose freely among the State's higher education programs are subject to scrutiny under Fordice.
The Court also made clear that policies traceable to de jure
segregation have a continued discriminatory effect if they help maintain the "racial identifiability" of a university.505 U.S. at 733. The Court has long held that racial identifiability of a school signals the need for careful scrutiny. However, "[r]acial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation." Freeman, 503 U.S. at 494. The fact that "an institution is predominantly white or black does not in itself make out a constitutional violation." Fordice, 505 U.S. at 743.
Accordingly, the second step in the analysis is a determination whether the policy or practice reduces educational choices available to students or solidifies the racial identifiability of institutions. A policy or practice that is rooted in de jure
segregation, but that does not tend to limit student educational choice or racial diversity in institutions may be found to have no segregative effects and therefore may be acceptable underFordice. See Ayers v. Fordice, 111 F.3d at 1220 (upholding district court's finding that duplicative programs did not have segregative effects when the institutions were not geographically proximate). Otherwise, the constitutionality of the policy or practice depends upon whether it is supported by a sound educational justification that cannot be achieved through less segregative means.
4. Educational Justification
In Fordice, the Court stated that a "sound educational policy" may justify retention of a program or policy that has continuing segregative effects if it cannot be practicably eliminated. 505 U.S. at 729-30; see also id. at 747 (Thomas, J., concurring) ("an otherwise unconstitutional policy may be justified if it serves `important and legitimate ends' . . . or if its elimination is not `practicable'"). While the various opinions in Fordice do not provide examples of sound educational policies, we believe the following considerations help establish a range of appropriate educational justifications.
It appears reasonable to conclude that the courts would adhere to their long tradition of deference to the educational judgments of educators.[9] For example, the Court has recognized the broad discretion of university educators in matters of faculty academic freedom, e.g., Keyishian v. Board of Regents of theUniversity of the State of New York, 385 U.S. 589, 603 (1967), admission and evaluation of students, e.g., Board of Curators ofthe University of Missouri v. Horowitz, 435 U.S. 78, 96 (1978), and other issues. The Court extended such deference in the civil rights context most recently in Grutter v. Bollinger,539 U.S. 306, 328 (2003), when it deferred to the University of Michigan Law School's determination that diversity is essential to its educational mission. The Court observed that, "given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." Id. at 329. In that case, the Court also affirmed that the educational decisions of university officials are presumed to be made in good faith, in the absence of a showing to the contrary. Id. In our view, the State's educators are entitled to a similar degree of deference in their identification of sound educational bases with two important caveats.
First, as Justice O'Connor stressed, an educational justification must be scrutinized to ensure that it does not "merely mask" the perpetuation of segregative practices,Fordice, 505 U.S. at 744 (O'Connor, concurring). Thus, the proffered justification should be supported by sound reasoning and, where available, empirical evidence. Moreover, such justifications may not violate the terms of any applicable OCR agreement.
Second, the justification should be assessed in light of the State's expressed goals and priorities. The General Assembly has established by statute a systematic basis for analyzing, planning, and setting priorities in higher education policy. The Maryland Higher Education Commission must periodically produce a State Plan for Higher Education, developed in consultation with post-secondary education officials across the State. Annotated Code of Maryland, Education Article ("ED"), § 11-105. That plan is to identify higher education needs, present capabilities, and future objectives and priorities. ED § 11-105(b)(2). If the educational justification for a proposal is inconsistent with the statewide objectives and priorities, it is unlikely to be deemed "sound educational policy." On the other hand, university policies and practices that advance the educational goals and priorities of these strategic plans are likely to meet theFordice standard of "educational soundness."
 5. "Practicable Elimination" of Policies with Segregative Effect
Even if a policy or practice is educationally sound, it cannot be maintained if it has a segregative effect that can be practicably eliminated without undermining the policy goal. Thus, policies and practices must be reviewed to determine whether their objectives can be achieved by less segregative means. In particular, that review must include an inquiry into any feasible alternatives that would meet the educational need while enhancing student choice and lessening the racial identifiability of the State's institutions. Otherwise, under Justice O'Connor's approach, a court might infer that the State is not acting in good faith.
B. Analysis of Policies Discussed in Fordice
You also asked how one would determine whether Maryland has discharged its responsibilities with respect to the four policies analyzed by the Supreme Court in Fordice: admissions standards, program duplication, institutional mission assignments, and continued operation of all previously segregated institutions. In our view, the framework outlined in the previous section should be applied.
It is important to keep in mind that no single policy should be reviewed in isolation, as individual factors may have "combined effects" on the desegregation of institutions that must be considered. Fordice, 505 U.S. at 739. Nonetheless, it is possible for the State to have dismantled some aspects of prior segregation, and be discharged of any remedial obligation with respect to those factors, while remaining responsible for remedial measures in other areas. Freeman, 503 U.S. at 491.
1. Admissions Standards
The Supreme Court in Fordice faulted Mississippi's rigid admissions standards because the high minimum ACT scores for that state's TWIs foreclosed admission to those schools by large numbers of African American students. 505 U.S. at 734. The Court suggested that the infirmity in Mississippi's admissions standards could be cured by incorporating other factors in addition to ACT scores, especially high school grades. Id.
at 735-37.
To determine whether the admissions standards of Maryland institutions are traceable to de jure segregation and suffer from the same failings requires an inquiry into the existing standards and how those standards have been refined since 1969. Among the questions to be considered are: the extent to which the admissions standards automatically exclude large numbers of African American students from admission to Maryland's TWIs, the extent to which individual institutions craft campus-specific standards, the use of factors other than standardized test scores in screening applicants,[10] and the ability to admit able students who may not meet technical minimum standards.
2. Program Duplication
The State's maintenance of geographically proximate HBCUs and TWIs with overlapping programs is, as the Fordice Court observed, "part and parcel of the prior dual system of higher education." 505 U.S. at 738. As noted above, the Court particularly focused on "unnecessary" program duplication, defined as "duplication at the bachelor's level of nonbasic liberal arts and sciences course work and all duplication at the master's level and above." Thus, many policies that produce "unnecessary" program duplication[11] are traceable to dejure segregation, and the State has the burden of proving that such duplication otherwise meets Fordice standards.
A policy or practice that results in "unnecessary program duplication" must be scrutinized for segregative effects. A policy or practice has segregative effects "by influencing student enrollment decisions or by fostering segregation in other facets of the university system." 505 U.S. at 731. As discussed in Section II.A.4 above, the State may legitimately assert a range of educational justifications for duplicate programs. If the justification is consistent with the State Plan for Higher Education or the current OCR agreement and supported by sound reasoning and empirical evidence, we believe that it has satisfied the criterion of educational soundness.
The question then is whether those legitimate educational objectives can be met without the same segregative effect. With respect to broad, statewide goals, such as increasing graduate education capacity in a particular field to meet growing workforce needs, the expansion of an existing program at an HBCU may well provide a practicable, less segregative alternative to a new, duplicative program. Where educational justifications are institution-specific, such as the efficient and effective use of institution resources, or the desire to increase the institution's own diversity, it may be more difficult to identify practicable alternatives. In some instances, important educational goals may be achieved through joint degree, resource sharing or regional programs, in which TWIs and HBCUs cooperate in a manner that breaks down institutional racial identifiability while advancing important higher education priorities.[12]
Finally, we note that Maryland law provides for rigorous review of all new program proposals by MHEC to determine their consistency with the State Plan for Higher Education and the State's equal educational opportunity obligations, and to consider whether they create "unreasonable program duplication" that would cause "demonstrable harm to another institution." ED § 11-206.1. An examination of whether Maryland has met its obligations under Fordice with respect to program duplication must take account of the State's legislative commitment to equal educational opportunity in its ongoing program review and the implementation of that process to date. Such review may be evidence of whether the State has made the good faith commitment, required under Dowell and Freeman, to meeting its remedial obligations.
3. Limitations on HBCU Institutional Mission
In Fordice, the Court found Mississippi's assignment of restrictive missions to its HBCUs to be constitutionally suspect. By virtue of their limited missions, the Court reasoned, the HBCUs received fewer resources and were less attractive to students. 505 U.S. at 740-41.
The missions of Maryland's institutions have been the subject of comprehensive reviews, subject to OCR desegregation plans, on two occasions. A comprehensive institution mission review was done as part of the 1985 Plan. More recently, under the 2000 Agreement, each Maryland institution revised its mission statement to ensure compliance with the State Plan for Higher Education, to support high demand programs at HBCUs, to enhance the institutional identity of HBCUs and to discourage the promotion of racial identity, segregation and racial discrimination. 2000 Agreement at 33-34. Comprehensive, statewide higher education mission review will occur again in 2005-6.
In light of these ongoing systematic efforts to refine institutional missions, a threshold question is whether the institutions' current mission statements are traceable to dejure segregation. If that link is found, then institutional missions must also be scrutinized to determine if they have segregative effects and, if so, to assess whether they advance educational goals that cannot be achieved through less segregative means. In addition, in determining whether these reviews were undertaken by the State in a good faith effort to comply with its obligations under Fordice, a court would also look to the State's compliance with its agreements with OCR with respect to institutional missions.
4. Continued Operation of Institutions
In Fordice, the Supreme Court found that the continuation of all eight of the Mississippi universities established under dejure segregation was constitutionally suspect. 505 U.S. at 742. This aspect of the Fordice opinion, taken together with the Court's admonitions regarding racial identifiability of campuses, caused great alarm to many[13] because it suggested that HBCUs should not continue to exist as independent institutions that provided an African American-focused environment, culture and education for students who might prefer it. We do not believe that Fordice requires remedies that eradicate or blur the African American identity of Maryland's HBCUs through institutional closures or mergers.
First, the Constitution does not compel that outcome. The paramount reason for condemning "separate but equal" K-12 education in the 1954 Brown decision was a "sense of inferiority" or stigma that segregation inflicted upon African American children and its impact on learning. Brown,347 U.S. at 494. As Justice Marshall has observed, a "vestige" of segregation is a "condition that is likely to convey the message of inferiority implicit in a policy of segregation." Dowell,498 U.S. at 260-61 (Marshall, J., dissenting). That stigma is absent when African American students seek enrollment in HBCUs as a positive choice. As Justice Thomas stated in his concurring opinion in Fordice, it may be educationally sound for a State to maintain "a diverse assortment of institutions — including historically black institutions — open to all on a race-neutral basis, but with established traditions and programs that might disproportionately appeal to one race or another."505 U.S. at 749. OCR also appeared to embrace this view in its 1994 Notice, which cast doubt on any Fordice remedies that might harm HBCUs.
Fordice did not trigger court-ordered closures and mergers of HBCUs. Nor were such measures part of Maryland's various desegregation plans with OCR. Moreover, after completion of desegregation litigation in four states, and OCR-supervised desegregation efforts in 14 other states, the nation's public HBCUs continue to operate as predominantly African American institutions.
Thus, although the Fordice opinion alluded to the closure of institutions to promote racial balance, it is not compelled. Where educational, economic, or equal opportunity benefits may be gained from institutional resource consolidation, institutions may explore instead cooperative measures that achieve those goals while preserving the positive institutional identity of HBCUs.
C. Other Factors
 1. Factors Identified in OCR Agreements
Finally, you asked us to identify other factors that should be evaluated in an effort to determine whether Maryland has dismantled its de jure segregated higher education system. The answer to this question is informed by Maryland's decades of work with OCR, spanning multiple desegregation plans, to identify policies with segregative effects and to implement appropriate remedies. The consensus reached by Maryland educators and OCR officials undoubtedly identified the universe of areas where remediation might be appropriate.
The most recent such effort resulted in the 2000 Agreement. It consists of nine commitments, most of which are distinct from the four factors addressed by the Court in Fordice:
 1. Strengthening Academic and Teacher Preparation Programs
 2. Strengthening the Partnership with Elementary and Secondary School Stakeholders
3. Strengthening Recruitment and Admissions
4. Strengthening Retention and Graduation
5. Improving Campus Climate and Environment
 6. Improving Diversity of Faculty/Staff and Governing Advisory Boards
 7. Improving and Expanding 2 + 2 (i.e., Community College) Partnerships and Articulation
 8. A voiding Unnecessary Program Duplication and Expansion of Mission and Program Uniqueness and Institutional Identity at the HBCUs
 9. Enhancing Maryland's Historically Black Colleges and Universities
For each commitment, the State also agreed to complete a set of discrete activities. Each of these commitments appears designed to enhance student choice or reduce the stigmatic racial identifiability of institutions. The last of these commitments is discussed further below.
2. Additional HBCU Resources
We understand that Commitment 9, "Enhancing Maryland's Historically Black Colleges and Universities," has been highlighted for particular attention in MHEC's review of the State's compliance with the 2000 Agreement. Commitment 9 contains both specific enhanced funding provisions and a general pledge to "design measures which ensure that the HBCUs are comparable and competitive with the TWIs in all facets of their operations and programs." 2000 Agreement at 35. The 2000 Agreement lists numerous aspects of campus operations subject to enhancement under this standard, including lower student-faculty ratios, improved campus facilities and ambiance, unique, high-quality academic programs, development of research infrastructure and public transportation. Funding enhancements were also a prominent element of the 1985 Maryland desegregation plan.
While the Court in Fordice stressed that funding increases could not be required to improve HBCUs as "publicly financed, exclusively black enclaves by private choice," it declined to decide whether the Mississippi HBCUs were entitled to additional funding, because the district court had yet to determine whether such enhanced funding was necessary to dismantle Mississippi's segregated system. 505 U.S. at 743. Because the Fordice opinion did not further elaborate on the issue of enhanced funding to HBCUs, we will review briefly other cases that deal with the role of enhanced funding in desegregation cases and decrees.
Enhanced funding may be part of a desegregation decree designed to "restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct."Milliken v. Bradley, 418 U.S. 717 (1974) (Milliken I). Such funding may be particularly important when other measures to achieve racial balance are infeasible. Milliken v. Bradley,433 U.S. 267, 281-288 (1977) (Milliken II); see also Jenkins v.Missouri, 807 F.2d 657, 685 (8th Cir. 1986), cert. denied,484 U.S. 816 (1987) (describing $37,000,000 capital improvement program as "an important factor in the overall success" of Kansas City's desegregation plan).
Enhanced funding has been a common element of post-Fordice
higher education desegregation remedies. For example, in Alabama, the post-Fordice remedial decree included the establishment and initial funding of foundations, known as Trusts for Educational Excellence, for the purpose of investing public and private funds for educational purposes at two HBCUs. Knight, 900 F.Supp. 272,349 (N.D.Ala. 1995). The decree also required continued special funding for HBCU enhancements and desegregation planning and minority scholarships. Id. at 310. Mississippi's desegregation remedy included the establishment of new graduate programs, the building of new campus facilities and enhanced facilities maintenance funding at its HBCUs. Ayers v. Thompson,358 F.3d 356, 363-64 (5th Cir.), cert. denied, 125 S.Ct. 372 (2004)
The assessment of when enhancements are sufficient or necessary to overcome past funding deficiencies under de jure segregation is a difficult determination. Based on the principle that a remedial measure is required "only insofar as it advances the ultimate objective of alleviating the initial constitutional violation," Freeman, 503 U.S. at 489, the courts have sometimes rejected enhanced funding as a necessary component of school desegregation plans. In Missouri v. Jenkins, 515 U.S. 70
(1995), the Supreme Court held that continued court-ordered State funding for educational enhancements to remedy substandard minority achievement was improper, where the students' educational needs were not directly traceable to past segregation, but rather to "numerous external factors beyond the control of the [school system] and state." Id.
at 101.[14]
To the extent that enhancements are necessary to cure funding inequities traceable to de jure segregation, then they are constitutionally required. If enhancements are needed to address other concerns not traceable to de jure segregation in Maryland's universities, then they are not constitutionally mandated. Nevertheless, such measures, particularly those intended to enhance educational opportunities for disadvantaged students, have an important place in the State's public funding priorities.
3. Good Faith Compliance
Finally, as State education officials review Maryland's history of desegregation efforts, in light of the impending expiration of the 2000 Agreement, it is important to keep in mind that a state's long-term commitment to dismantling segregation is central to an evaluation of its success in meeting constitutional obligations. "A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new dejure violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future." Freeman, 503 U.S. at 498, citing Morgan v.Nucci, 831 F.2d at 321 ("A finding of good faith . . . reduces the possibility that a school system's compliance with court orders is but a temporary constitutional ritual").
It is significant that Maryland is not, and has never been, subject to court-ordered higher education desegregation remedies. On the only occasion when the courts have intervened, they did so in 1976 to bar OCR from instituting enforcement proceedings against the State. Mandel, 411 F.Supp. at 542. Since then, during decades of voluntary desegregation plans, OCR has never determined that the State's efforts were inadequate. Moreover, Maryland's participation in the 2000 Agreement was voluntary, and the Agreement's terms were developed through negotiations between Maryland higher education officials, other State leaders, and OCR representatives. In some instances, the provisions of the 2000 Agreement may exceed constitutional requirements. However, the State's efforts to comply with the terms of that Agreement may provide evidence that the State has acted in good faith to meet its constitutional obligations.
 III Conclusion
In summary, our answers to your questions are as follows:
1. How to assess policies and programs generally underFordice: In our view, the Fordice decision requires the following four-step assessment of the State's higher education policies and practices:
 A — Is the policy or practice traceable to prior segregation?
If it is not, the inquiry ends.
If it is, then an analysis of the effects of the policy or practice is necessary.
 B — Does the policy or practice have segregative effects?
If it does not, the inquiry ends.
If it does, then the justification for the policy or practice must be evaluated.
 C — Is the policy or practice supported by sound educational purposes?
 If it is not, then it is not consistent with the State's obligations under the Equal Protection Clause and Title VI, as construed in the Fordice decision.
 If it is, then alternative ways of accomplishing those purposes must be considered.
 In evaluating educational justifications, substantial deference is accorded to the judgment of educators, particularly when that judgment advances well-reasoned goals and is supported by evidence. The priorities established in the State Plan for Higher Education or in the current OCR agreement may provide a sound educational basis for such policies.
 D — Can the educational purposes of the policy or practice be feasibly accomplished by less segregative means?
 If they can, then the policy or practice is not consistent with the State's obligations under the Equal Protection Clause and Title VI.
 If they cannot, then the policy or practice is consistent with the State's obligations under the Equal Protection Clause and Title VI.
2. How to assess whether the State has discharged itsresponsibilities with respect to the four policies identified bythe Supreme Court in Fordice: For each policy, the analysis set forth in (1) must be applied.
3. Whether other factors related to Maryland's highereducation system should be evaluated and, if so, what thosefactors may be.
The State's responsibilities extend to any policies and practices traceable to de jure segregation that have segregative effects. The current agreement with OCR identifies other factors that may be implicated in the dismantling of the State's previously segregated higher education programs.
In addition to the review of specific policies under theFordice standards, the assessment of Maryland's success in dismantling the system of de jure segregation must also take account of the extent to which the State has complied in good faith with the requirements of its desegregation plans over several decades.
 J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] We understand that Maryland's higher education officials are undertaking a thorough compliance review in light of the pending expiration of its current desegregation plan. See
Part I.D.3, below. The Attorney General's Office will assist in that effort.
[2] Compare Alabama State Teachers Association v. AlabamaPublic School and College Authority, 289 F.Supp 784, 787 (M.D. Ala 1968), aff'd, 393 U.S. 400 (1969) (per curiam) (affirming refusal to bar construction of an Alabama TWI branch near an HBCU on grounds that elimination of discriminatory policies was sufficient to meet a university's desegregation duties, characterized as less extensive than those articulated inGreen) with Norris v. State Council of Higher Education,327 F. Supp 1368 (E.D. Va.), aff'd, 404 U.S. 907 (1971) (per curiam) (affirming application of Green in ban on upgrading of a two-year Virginia TWI to a four-year college).
[3] For the purposes of analyzing the desegregation obligations of public higher education institutions, the Supreme Court has made clear that "Title VI's protection extends no further than the Fourteenth Amendment" and, thus, that the analysis of those obligations is the same under Title VI and the Constitution.Fordice, 505 U.S. at 732 n. 7.
[4] OCR became part of the federal Department of Education when the latter was created in 1980. Pub.L. No. 96-88, 93 Stat. 668
(October 1979).
[5] Similar letters were sent to public officials in each of the other States that had maintained racially segregated public higher education systems.
[6] For example, Judge Harold L. Murphy of the Northern District of Alabama, expressed exasperation at the task of fashioning a post-Fordice remedy:
 If the Court has erred, it is not the result of bad lawyering by the attorneys or lack of consideration by the Court. If this case should again be appealed, and the higher courts again return the case to this Court, the Court earnestly seeks guidance. This Court will enforce whatever remedy the higher courts think appropriate. This Court has done all it can do.
Knight v. Alabama, 900 F.Supp. 272, 280-81 (N.D. Ala. 1995).
[7] E.g., Fordice, 505 U.S. at 760 (Scalia, J., concurring and dissenting) (opinion will create years of "litigation-driven" confusion); Lorne Fienberg, United States v. Fordice and theDesegregation of Public Higher Education: Groping for Root andBranch, 34 B.C. L.Rev. 803, 806, 850 (1993) (opinion will result in "chain reaction" of lower court activity).
[8] The State acknowledged that it had not achieved compliance with objectives setting numerical goals for the employment of African American staff, and for the transfer of African American students from two-year to four-year institutions. 1985 Plan Final Report, at 25, 30-32.
[9] This view is consistent with post-Fordice decisions in the federal courts applying the "educational soundness" principle. See, e.g., United States v. Louisiana, 9 F.3d 1159,1170 (5th Cir. 1993) (ordering district court to review a finding of impermissible program duplication to determine whether the program advanced "the educational goals of classifying students by their level of preparedness and of retaining qualified faculty and administrators at the schools which originally attracted them"); Knight, 900 F. Supp. at 294-96
(accepting as a sound educational justification the retention or enhancement of student and faculty diversity at particular schools).
[10] These may include, for example, high school grades, core subject matter competency, citizenship, leadership, special talents, and other individual student attributes.
[11] The phrase "unnecessary program duplication," as defined in Fordice, can be a source of confusion. The Court employed the phrase to identify instances of program duplication that must be scrutinized under the Fordice analysis. Whether "unnecessary" duplication is unconstitutional duplication depends the results of that analysis.
[12] This approach has been approved in other states. InKnight, 900 F.Supp. at 296-300, for example, the district court rejected plaintiffs' argument that specialized TWI programs that duplicated similar academic offerings at a proximate HBCU should be closed. At the same time, the court affirmed provisions of an earlier decree calling for joint and cooperative programs between proximate TWIs and HBCUs. It lauded efforts to collaborate on cooperative graduate degree programs in business, nursing, special education and social work as having desegregative potential while "conserv[ing] financial resources." Id.
at 300.
[13] See Section I.B. above.
[14] The Court also rejected the goal of stemming "white flight" out of the jurisdiction as a private, residential choice and thus not the legitimate basis for court-ordered desegregation relief. 515 U.S. at 97; see also Freeman v. Pitts,503 U.S. 467, 496 (1992); see also School Board of the City of Richmond,Virginia v. Baliles, 829 F.2d 1308, 1314 (4th Cir. 1987). *Page 187